**Vera L. POLLOCK, Appellant,**

v.

**AMERICAN TELEPHONE & TELEGRAPH LONG LINES.**

**No. 85–5395.**

United States Court of Appeals, Third Circuit.

Argued June 2, 1986.

Decided June 30, 1986.

Kenneth J. Hall, (argued), Hall & Hasan, Newark, N.J., John H. Curley, Steven L. Strelitz (argued), for appellant.

AT & T Communications, Inc., Basking Ridge, N.J., for appellee.

Before GIBBONS, BECKER and STAPLETON, Circuit Judges.

### OPINION OF THE COURT

GIBBONS, Circuit Judge:

Vera L. Pollock, a former employee of American Telephone & Telegraph Long Lines (AT & T), brought suit against AT & T alleging that AT & T had discriminated against her on the basis of her race and in retaliation for her filing of a discrimination charge with the Equal Employment Oppor-

tunity Commission (EEOC). The district court granted AT & T's motion for summary judgment and Pollock appealed. We reverse.

### I.

AT & T hired Pollock, who is black, on March 28, 1977 as a Correspondence Clerk in the Personnel Department. This position was rated Title Grade (TG)–4. Prior to her employment with AT & T, Pollock had worked for Western Electric, Inc. for a period of approximately thirteen years. After two months with AT & T, Pollock was promoted to the position of a Report Clerk in the Overseas Rates and Tariffs Department. This position was rated TG–5. Nine months later Pollock was again promoted, this time to the position of a Special Reports Clerk in the Overseas Financial Administration (OFA). This position was rated TG–6. TG–6 is the highest nonmanagement level clerical position at AT & T. In this position, Pollock's duties included the maintenance and administration of various satellite budgets, and the analysis and verification of monthly billing and revenue statements received from the Communications Satellite Corporation (COMSAT) and other telecommunications entities.

From the date of her promotion to a Special Reports Clerk until October 15, 1979, Pollock was under the immediate supervision of Daniel Campbell. During this time, Campbell evaluated Pollock's work performance on two occasions. The evaluations were made on a company form. There were five separate categories: productivity, quality of work, job skills, cooperation, and sense of responsibility and a point scale allocating one point for limited performance, three points for satisfactory, four for more than satisfactory, and six for outstanding.

Campbell first evaluated Pollock on March 13, 1979. Out of a possible thirty points, Campbell awarded Pollock seventeen. Campbell evaluated Pollock for the second time on July 13, 1979. This time

Campbell gave Pollock an overall rating of sixteen.

Sometime in July of 1979 Campbell suspended Pollock for one day for alleged insubordination on the telephone when Pollock called in for a personal day. On July 23, 1979 Pollock formally applied for a lateral transfer to Western Electric. No action was ever taken on this or any transfer request that she made.[1]

In October of 1979 Pollock was transferred from the billing subgroup in OFA to the budget subgroup and was assigned some of the clerical duties previously performed by a white male, John Mancuso, and a white female, Chris Fernandez. Mancuso was assigned Pollock's duties in the billing subgroup. Pollock remained in the budget subgroup for approximately eight months. During this time, her immediate supervisor was Emilie Schmidt. Schmidt was in turn supervised by Daniel Campbell, who had just been promoted to staff supervisor.

Schmidt conducted two evaluations of Pollock. The first occurred on February 28, 1980. Schmidt, with the concurrence of Campbell, awarded Pollock a total of fifteen points. The second took place on July 21, 1980, but was not presented to Pollock until August 15. This time Schmidt gave Pollock an overall rating of eleven. Pollock was very unhappy with these ratings. In the meantime, on July 9, 1980, Campbell suspended Pollock for three days allegedly for leaving work fifteen minutes early the previous Friday, as well as for "insubordination" and "misconduct."

Shortly after her receipt of her second evaluation from Schmidt, Pollock filed a discrimination charge with the EEOC. The charge is dated August 18, 1980. In the charge, Pollock averred that AT & T management, and particularly Daniel Campbell, harassed and intimidated her and gave her unfair evaluations because she was black. She claimed that the negative comments in her reviews were merely

1. Pollock also alleges that she made several verbal requests for transfer.

pretextual and that management intended to force her to quit or to fire her.

By October of 1980 Pollock returned to her former position in the billing subgroup of OFA, which in the interim had been occupied by Mancuso, and Mancuso returned to the budget subgroup. Upon her return Pollock fell under the direct supervision of Peter Norcia, who was himself supervised by Campbell. Norcia was Pollock's on-line supervisor until her discharge on February 22, 1982.

In her first evaluation by Norcia, dated February 2, 1981, Norcia gave Pollock a sixteen. Pollock told Norcia she was unhappy with the rating and believed that it came from Campbell, not Norcia. Norcia rated Pollock again on August 21, 1981 and gave her a seven. Pollock voiced complete disagreement with the evaluation and declared she was being treated unfairly.

On August 28, 1981 Norcia gave Pollock a warning letter. It stated that continued poor performance would not be tolerated and that if she did not improve she could be demoted or dismissed. Two weeks later, on September 11, Norcia suspended Pollock for approximately a week for making an error in a travel voucher. Pollock had claimed reimbursement for using her own car for business and had recorded the distance as 73 miles. AT & T believed, however, that it should only have been 26 miles. Upon her return to work, Norcia issued Pollock a second letter of warning dated September 28, 1981.

On December 23, 1981 Norcia gave Pollock another evaluation, and awarded her a total of nine points. In addition, on that same day, Norcia suspended Pollock for thirty days allegedly for poor job performance and misconduct. The suspension mainly grew out of an incident in which Norcia confronted Pollock about a note she had sent to another manager complaining of another employee's tardiness in completing his work. Pollock allegedly snatched the note out of Norcia's hand, tore it up, and then refused to respond to any of his questions.

On January 21, 1982 Norcia issued Pollock a final warning of dismissal. On February 19 Norcia submitted a report on Pollock's job performance to Campbell. Two days later the company made out a final evaluation of Pollock, rated her a seven, and fired her.

Three days after her discharge, Pollock filed a second discrimination charge with the EEOC. She received a Notice of Right to Sue, and filed a complaint in the district court alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2(a)(1) (1982), of 42 U.S.C. § 1981 (1982), and of the New Jersey Law Against Discrimination, N.J.Stat.Ann. §§ 10:5–1 to 10:5–42 (West 1976 & Supp. 1985). The complaint charges AT & T with engaging in five specific racially discriminatory or improper retaliatory actions: 1) giving Pollock unfairly low evaluations, 2) assigning her work that was previously performed by two white employees, 3) suspending her for three days on July 9, 1980, 4) suspending her for approximately a week on September 11, 1981, and 5) discharging her. In her other papers and at oral argument, Pollock also charged AT & T with discriminating against her in refusing to transfer her.

AT & T moved for summary judgment and filed affidavits executed by Campbell and Norcia, Pollock's entire deposition, Pollock's evaluations, the evaluations of another black employee, Mary Thomas Majette, and several internal company memoranda. In response, Pollock filed her own affidavit, the affidavit of John Mancuso, a white male and former fellow employee of Pollock, portions of her deposition testimony, her evaluations, and two letters congratulating her on perfect attendance in 1980.

The evidence submitted to the district court revealed the following about the six areas of discriminatory conduct of which Pollock complains.

## A. *Evaluations*

Pollock alleges that she was given unfairly low evaluations because she is black and because she filed a discrimination

charge with the EEOC. She further alleges that although she performed her work in a satisfactory manner, her evaluations were substantially lower than those of two white Special Reports Clerks, Chris Fernandez and John Mancuso. In her deposition, however, Pollock admits that she has no knowledge of other employees' evaluations.

AT & T, on the other hand, alleges that Pollock was given low evaluations because she failed to complete the COMSAT bill, was insubordinate and uncooperative, and engaged in misconduct. The company evaluations are replete with references to and descriptions of such instances. To dispel any inference of discrimination, AT & T also introduced the evaluations of another black Special Reports Clerk, Mary Thomas Majette. Majette received scores ranging from 24 to 30 points on her evaluations for the years 1978 through 1982 from the same supervisors that rated Pollock.

Pollock, in her affidavit and her deposition testimony, denies the charges made by AT & T. Her denial is corroborated in part by the affidavit of John Mancuso, a former white employee at AT & T. In the affidavit Mancuso avers that Pollock's scores, if based on any problems with the COMSAT bill, were unfair because no clerk could complete it alone; management input was required.

### B. *Work Assignment*

Pollock alleges that at the time she came under Schmidt's direct supervision, she was given work formerly performed by two white employees, Fernandez and Mancuso, because of her race. AT & T claims that the work reassignments were the result of a reorganization of the department in which Pollock worked.

### C. *Three-day Suspension in July 1980*

Pollock claims she was given the three-day suspension because she is black. She avers that she did not leave work fifteen minutes early on the particular Friday in question, but that she went to the restroom for a short period of time. Moreover Pollock testified in her deposition that white employees such as Debbie Thompson and John Mancuso were not disciplined for being away from their desks. Mancuso partially corroborates Pollock in his affidavit, stating that he was with Pollock on that afternoon and knows that she did not leave work until quitting time. AT & T, however, disputes Pollock's and Mancuso's version of the facts, and has submitted a note written by another manager stating that she observed Pollock leaving early.

### D. *September 11, 1981 Suspension*

Pollock alleges that her suspension was racially motivated or was in retaliation for filing the August 1980 discrimination charge. She avers that she simply made a mistake on her travel voucher, that mistakes were made all the time, and that no one else was ever suspended for making such mistakes. She claims that she observed that other employees made errors in their vouchers while she was working in the budget group, but that none of the employees who made the errors was disciplined. In his affidavit, Mancuso alleges that he made a similar error in a travel voucher but was not disciplined. Moreover he avers that to his knowledge no one had ever been disciplined for committing an error on a voucher. AT & T submitted Norcia's affidavit on this point and in it Norcia characterizes the error as deliberate falsification of a company document.

### E. *Discharge*

Pollock claims she was discharged because of her race and because she filed a previous discrimination charge with the EEOC. She admits, however, that no one ever made racist remarks or mentioned the EEOC charge to her. In fact, her first rating after the filing of the charge was a 16. AT & T avers that she was discharged for overall poor work performance and misconduct. Her poor performance and the instances of misconduct, particularly insubordination, are well-documented on the evaluation forms.

Pollock alleges, however, that these reasons are a mere pretext for discrimination. She denies having engaged in any misconduct and claims that her problems with the COMSAT bill were common, that no employee could complete it alone, and that no one was ever disciplined or discharged for not completing it. In his affidavit Mancuso corroborates Pollock's statements regarding the bill. Mancuso's affidavit further states that he had worked on the bill and that it was his opinion that Pollock's work was as good as any clerk's. In her own affidavit, Pollock avers that when Mancuso could not complete the bill, she was assigned to help him, and that Mancuso was eventually relieved of this task, rather than fired, and she was reassigned to it. She also claims she did not refuse to follow her supervisor's instructions in completing the bill.

### F.  Transfer

Pollock alleges that AT & T failed to transfer her because AT & T wanted to fire her on account of her race and on account of her having filed the first EEOC charge. A rating of sixteen was necessary to obtain a transfer. Pollock alleges in her affidavit that several white employees, Mancuso, Thompson, and Gail Maggett, were allowed to transfer. Mancuso states in his affidavit that he obtained a transfer. AT & T offered evidence that Mancuso agreed to take a demotion in order to obtain a transfer, something to which Pollock would not agree.

### II.

In reviewing AT & T's motion for summary judgment, the district court followed a three-step procedure. First, the court assumed that Pollock had made out a prima facie case of racial discrimination. Second, the court acknowledged that AT & T had articulated several legitimate, nondiscriminatory reasons for its actions. Third, the court re-examined Pollock's case and concluded that Pollock's allegations of unlawful discrimination and retaliation were not supported by any concrete evidence. Thus

the court found that she made no showing that similarly situated white employees were treated more favorably, and she did not link AT & T's actions to the filing of the EEOC charge. Because in its view her allegations were completely uncorroborated and constituted mere "speculation, opinion and surmise," the court granted AT & T's motion for summary judgment.

### III.

In reviewing the district court's grant of a motion for summary judgment, our review is plenary. See Struble v. New Jersey Brewery Employees' Welfare Trust Fund, 732 F.2d 325, 330 (3d Cir.1984). The appropriate inquiry is whether, in viewing the facts and the inferences to be drawn from the facts in the light most favorable to the nonmovant, there exists a material issue of disputed fact. See Gans v. Mundy, 762 F.2d 338, 340 (3d Cir.1985); United States v. Athlone Industries, Inc., 746 F.2d 977, 981–82 (3d Cir.1984); EEOC v. Great Atlantic & Pacific Tea Co., 735 F.2d 69, 81 (3d Cir.1984). See also Graham v. F.B. Leopold Co., 779 F.2d 170, 172 (3d Cir.1985). In order to affirm it must be shown that there are no genuine issues of material fact in dispute and that the movant is entitled to judgment as a matter of law. Mundy, 762 F.2d at 340; Athlone, 746 F.2d at 982; Fed.R.Civ.P. 56.

In a Title VII case, the court's task is to determine whether upon viewing all of the facts and the reasonable inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff. See EEOC v. Hall's Motor Transit Co., 789 F.2d 1011, 1015 (3d Cir.1986); Graham, 779 F.2d at 173. Thus, the plaintiff can withstand a motion for summary judgment if she produces direct evidence of discriminatory intent or indirect evidence from which a factfinder can rationally infer that the employer's justifications were pretextual and that racial discrimination more likely than not motivated the employer's

actions. *See Hall's Motor Transit*, at 1015; *Graham*, 779 F.2d at 173.

### IV.

■ Viewing the summary judgment record in this case in the manner required by Federal Rule of Civil Procedure 56, we hold that the evidence is sufficient to create a genuine issue of material fact as to whether, in at least some instances, AT & T intentionally discriminated against Pollock. The record contains more than simple accusations and speculation. Pollock points to facts that give rise to an inference of discrimination. In addition, Mancuso, a white employee, corroborates Pollock in his affidavit and points to certain facts and certain of his own experiences at AT & T that give rise to an inference that AT & T discriminated against Pollock. Thus, contrary to what the district court believed, there is sufficient evidence in this summary judgment record to put AT & T's motivation in issue. In such a case, it is not within our province, nor that of the district court, to resolve this issue of fact on a motion for summary judgment. Therefore, the district court's grant of summary judgment will be reversed and the case remanded for trial.