**Larry JORDAN, Plaintiff,**

**v.**

**ALLGROUP WHEATON, Defendant.**

**CIVIL ACTION No. 01–3244(JEI).**

United States District Court,
D. New Jersey.

Sept. 4, 2002.

Larry Jordan, Bridgeton, NJ, Pro Se Plaintiff.

Ballard Spahr Andrews & Ingersoll LLP by Maureen M. Rayborn, Esq., Abigail L. Flitter, Esq., Voorhees, NJ, for Defendant.

## OPINION

IRENAS, District Judge.

*Pro se* Plaintiff, Larry Jordan, brought this employment discrimination action against Defendant AllGroup Wheaton, his former employer, alleging racial discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et. seq.*, and the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1, *et. seq.* This Court has jurisdiction over Plaintiff's Title VII claim pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's LAD claim pursuant to 28 U.S.C. § 1367. Presently before the Court are cross-motions for summary judgment by both parties.[1] Because Plaintiff has failed to adduce sufficient evidence to rebut Defendant's proffered legitimate, non-discriminatory reasons for his termination, the Court will deny Plaintiff's motion for summary judgment and enter summary judgment in favor of Defendant AllGroup Wheaton.

## I.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248, 106 S.Ct. 2505 (citation omitted).

## II.

Defendant AllGroup Wheaton ("Wheaton") is engaged in the business of manufacturing glass containers for companies in the pharmaceutical and cosmetic industries. Plaintiff Larry Jordan ("Jordan"), an African–American male, was employed at Defendant's Millville, New Jersey facility from April 19, 1976 until he was terminated on February 1, 2000. Over the course of his employment, Plaintiff occupied various jobs in the Mold Service Division of the manufacturing plant. In his complaint and his deposition testimony, Plaintiff recounts a series of incidents oc-

---

1. While Plaintiff has not formally submitted a motion for summary judgment, Defendant appears to have treated a document entitled "Letter Brief for Dispositive Motions," one of Plaintiff's many random and indecipherable filings with this Court, as a dispositive motion for summary judgment and has, accordingly, filed a brief opposing the entry of summary judgment in Plaintiff's favor. For purposes of bringing some semblance of order to the jumble of seemingly unconnected filings in this matter, the Court will excuse Plaintiff's unfamiliarity with the formalities of civil motion practice and regard Plaintiff's correspondence as a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

curring between June 1999 and the date of his termination which he contends demonstrate that he was unfairly singled out and "harassed" by his supervisors at the facility and ultimately terminated because of his race.[2]

On June 3, 1999, Jordan and the rest of the crew assigned to the midnight shift, all of whom, with one exception, were also African–American, were leaning against stools and polishing molds when Nancy Davis, the shift supervisor, approached Jordan and explained that, for safety reasons, he was not permitted to sit while polishing molds. (Jordan Dep. at 68–69; 82, attached as Ex. A to Def.'s Br. Supp. Mot. Sum. Judg.) (hereinafter "Jordan Dep."); Affidavit of Nancy Davis at ¶¶ 5–6, attached as Ex. G to Def.'s Br. Supp. Mot. Sum. Judg. (hereinafter "Davis Aff."). Jordan protested and refused to follow her instructions, explaining that his back was hurting him. (Jordan Dep. at 70–71). An argument ensued between the two in which Jordan raised his voice and may have uttered an expletive. (*Id.* at 70). Davis called Joe Sharp, the Mold Service Department Manager, at his home and sought his advice about how to handle Jordan's insistence on remaining seated while working with the molds. (6/3/99 Davis Employee Contact Report, attached as Ex. H to Def.'s Br. Supp. Mot. Sum. Judg.; Davis Aff. at ¶ 14). Sharp recommended that Davis send Jordan home if he continued to complain about having problems with his back. When Davis spoke with Jordan again, he continued to complain about having back pain and suggest-

ed that he might require hospitalization. (Jordan Dep. at 70; Davis Aff. at ¶ 12). Jordan was released from work and arrangements were made to have one of the plant's security officers drive him to the hospital. According to a report filed by Davis, she overheard Jordan uttering profanities at her as he left the building. (6/3/99 Davis Employee Contact Report; Davis Aff. at ¶ 14). Consequently, when Jordan returned to work later that night, he was called into Sharp's office, reprimanded, and informed that he was being suspended for his insubordinate and disruptive behavior earlier that evening. (Jordan Dep. at 71). Jordan yelled at Sharp and walked out the door. (6/3/99 Sharp Employee Contact Report). Following closely behind him, Sharp warned Jordan that his shift was not over and that he did not, therefore, have permission to leave. In response, Jordan turned toward Sharp, yelled some profanities, accused him of being a "racist," and warned, "I'll be back and I'll bring something for you." (*Id.*; Jordan Dep. at 72–73).

On June 7, 1999, Jordan and union representatives Charlie Weiser and Bob Martin[3] met with Sharp and various company representatives to discuss the events of June 3, 1999. (Affidavit of John Andrew Chebra at ¶ 12, attached as Ex. C. to Def.'s Br. Supp. Mot. Sum. Judg. (hereinafter "Chebra Aff.")). At the meeting, Jordan did not deny yelling or cursing at both Davis and Sharp, nor did he deny refusing to stand while polishing. (*Id.*) Representatives from the union and management nev-

---

**2.** Plaintiff has not submitted a statement of material facts along with either his own dispositive motion papers or his opposition to Defendant's motion for summary judgment as required by Local Rule 56.1 and the documents which Plaintiff has annexed to his motion papers are of little or no relevance to his claims. The relevant facts underlying Plaintiff's claims must therefore be drawn

primarily from Plaintiff's complaint, and the transcript of Plaintiff's deposition testimony, Defendant's Statement of Undisputed Material Facts and supporting exhibits.

**3.** Plaintiff was, at the time, a member of the Glass, Molders, Pottery, Plastics and Allied Workers International Union, Local 219, AFL–CIO–CLC.

ertheless agreed that, in lieu of a three-day suspension, Jordan would be referred to ACORN, the company's Employee Assistance Program, for anger-management counseling. (Jordan Dep. at 49, 83, 245; Chebra Aff. at ¶¶ 14,15).[4]

An incident report dated June 25, 1999 recounts another confrontation between Jordan and one of his supervisors. According to the report, which was filed by Ed Lawrence, another shift supervisor in the Mold Service Department, the incident began when Lawrence approached Jordan to inquire whether he had properly counted his "take out inserts," devices used to pick up glass bottles and place them on conveyer belts which will transport them to the annealing oven. (Statement of E. Lawrence, attached as Ex. L to Def.'s Br. Supp. Mot. Sum. Judg.; Jordan Dep. at 112–114; Chebra Aff. at ¶ 20). Jordan, who believed that this was not part of his job responsibilities, told Lawrence that he had not and would not do so and accused Lawrence of "harassing" him. (Jordan Dep. at 112–114). After calming down, Jordan apologized to Lawrence and was not formally disciplined for his behavior. (Statement of E. Lawrence; Jordan Dep. at 115).

On August 5, 1999, Jordan was involved in another dispute with Lawrence regarding the manner in which he performed his job responsibilities. Lawrence approached Jordan while he was polishing molds and instructed him to place a guard on the molds so that he could tell where to stop polishing. (Jordan Dep. at 87–90; 8/5/99 Lawrence Employee Contact Report, attached as Ex. M. to Def.'s Br. Supp. Mot. Sum. Judg. (hereinafter "8/5/99 Lawrence Report")). Jordan again accused Lawrence of "harassing" him and refused to follow his instructions, insisting that he

knew how to polish molds and did not need his shift supervisor telling him how to do his job. (Jordan Dep. at 89–90; 8/5/99 Lawrence Report). Jordan then went to see Sharp, Lawrence's supervisor, to complain about Lawrence telling him how to do his job. (Jordan Dep. at 87). When Sharp accompanied Jordan back to the service area to speak with Lawrence, Jordan exploded at Lawrence, telling him to "get the f* *k out of [his] face." (8/5/99 J. Sharp Employee Contact Report, attached as Ex. N to Def.'s Br. Supp. Mot. Sum. Judg. (hereinafter 8/5/99 Sharp Report); Jordan Dep. at 93–94). Jordan does not directly dispute Lawrence's description of this incident but rather places responsibility for the confrontation on Sharp whom he accuses of deliberately placing him in a situation which he knew would get out of hand. (Jordan Dep. at 87–88; 92–94).

Later that day, Jordan was called into a disciplinary meeting with representatives of management and the union. (Jordan Dep. at 95–96; Chebra Aff. at ¶ 22). When asked if he understood the purpose of the meeting, Jordan replied, "It is good to have meetings like this to discuss problems. People get killed over things like this all the time. Look what happened in Atlanta." (Jordan Dep. at 98, 101; Chebra Aff. at ¶¶ 23–24; 8/10/99 Statement of Michael Burrows and R.A. Parisi, attached as Ex. O to Def.'s Br. Supp. Mot. Sum. Judg.). This statement was apparently a reference to an incident in Atlanta, Georgia, on July 29, 1999 in which a day trader had murdered his family and then went to work where he opened fire on his fellow employees, killing nine and wounding 13 others. (Kevin Sack, *Shootings in Atlanta:The Overview; Killer Confessed in a Letter Spiked with Rage*, N.Y. Times, July

---

4. In the weeks following this meeting, Jordan attended approximately five counseling sessions with a licensed social worker. Wheaton supplied Jordan with transportation to and from each of these sessions.

31, 1999 and Jay Croft, *The Day Atlanta Can't Forget,* The Atlanta Journal and Constitution, September 26, 1999, attached as Ex. P. to Def.'s Br. Supp. Mot. Sum. Judg.; Jordan Dep. at 98–101; Chebra Aff. ¶ 24). At the conclusion of this meeting, Jordan was suspended for three days without pay pending termination. (Jordan Dep. at 94; Chebra Aff. at ¶ 26).

At the end of the three day period, Jordan requested a 30–day trial period during which he would try to correct his behavior and continue receiving anger-management counseling. (Chebra Aff. at ¶ 27). Jordan agreed to be evaluated by Wheaton's doctor, who recommended that Jordan continue participating in counseling sessions with a licensed mental health professional. (*Id.* at ¶ 30). Wheaton ultimately agreed to allow Jordan to return to work. However, as a condition of returning to work, Jordan was asked to memorialize his promise to improve his behavior and continue with counseling in writing. (Jordan Dep. at 103–04; Chebra Aff. at ¶¶ 31–32). Jordan subsequently executed a written agreement, referred to by Defendant as a "Last Chance Agreement," which provided as follows:

I, Larry Jordan, an employee of Wheaton USA, Inc. (the "Company"), after having been counseled by the Company, in the presence of my union representative(s), that my actions and behavior with respect to my job duties are not in compliance with the Company's Work Rules, and in order to induce the Company to consider the continuation of my employment, hereby agree that I will avail myself of further counseling services as was suggested on August 25, 1999 by the Company physician.

I agree to make contact with my primary care physician, Dr. Bear, no later than Wednesday September 8, 1999 to set up an appointment for treatment and/or referral and I agree to enter into and continue with such treatment and/or counseling as recommended by him until I have completed the full program and am released by my counselor and my PCP. I agree to provide Wheaton with the name of my counselor and my first appointment date.

I hereby authorize Wheaton to contact my counselor and/or Dr. Bear from time to time during this period for the sole and limited purpose of receiving written or verbal confirmation of my continuing participation in the program.

I agree to take part in the counseling/therapy in an effort to induce the Company to consider the continuation of my employment with Wheaton USA, Inc. I fully understand that this is my final counseling and a one-time opportunity and that if I do not abide by this Agreement, I will be subject to disciplinary action up to and including discharge.

(9/3/99 "Last Chance Agreement," attached as Ex. Q to Def.'s Br. Supp. Mot. Sum. Judg.). Jordan was warned that his failure to abide by the terms of this agreement and to obey the Company's work rules would subject him to further disciplinary action up to and including termination. (Chebra Aff. at ¶ 33). Jordan concedes that he never attended any counseling sessions. (Jordan Dep. at 109). He insists that he tried to honor the terms of his agreement, but was unable to locate a therapist or counselor willing to accept his medical insurance. (*Id.*).

On January 27, 2000, Jordan was involved in another incident at the Millville facility. Joseph Wilkerson, then acting Mold Service Foreman, noticed that three molds in the service polish area required polishing and asked Jordan, who was working as a service polisher at the time, to take care of the molds. (1/27/00 Statement of Joseph Wilkerson, attached as Ex. R to Def.'s Br. (hereinafter "1/27/00 Wilkerson Statement"); 1/29/00 Statement of

Matthew J. Kiley, attached as Ex. S to Def.'s Br. (hereinafter "1/29/00 Kiley Statement")). Wilkerson reported that Jordan ignored his instructions and instead disappeared into the break room, requiring him to recruit Matt Kiley, another service polisher, to complete the polishing of the molds. (1/27/00 Wilkerson Statement; 1/29/00 Kiley Statement). Jordan testified at his deposition that he does not recall ever being asked to service the molds. (Jordan Dep. at 121–122). According to his testimony, he was on his break when one of his co-workers approached him and told him that Matt Kiley was going to report him to management for failing to polish certain service molds. (*Id.* at 121). Jordan, angry about Kiley's plans to report him to management, confronted Kiley, repeatedly yelled at him to mind his own business, and challenged Kiley to tell Joe Sharp about his own workplace gambling activities. (*Id.* at 121–122). When another co-worker, Bob Martin, attempted to intervene, a shoving match ensued between the two. (*Id.* at 123; 1/29/00 Kiley Statement; 1/31/00 Bob Martin Statement, attached as Ex. T to Def.'s Br.). Although Kiley and the others present differ in their account of who initiated the physical altercation, according to Jordan, when Martin attempted to separate him and Kiley, Martin pushed him and, in response, Jordan pushed Martin back into Kiley. (Jordan at 123–124).

Kiley and Martin later reported the incident to Joe Sharp and Sharp called all three men into his office, along with Jordan's union representatives. (1/27/00 Statement of Joe Sharp, attached as Ex. U to Def.'s Br. (hereinafter "1/2700 Sharp Statement")). When asked by Sharp to describe what had happened, Jordan refused to respond because, according to his deposition testimony, he was reluctant to say anything that would get Martin or Kiley, his union brothers, into trouble. (Jordan Dep. at 128–129). Martin and Kiley, on the other hand, apparently felt less constrained by fealty to their fellow union brother, and did provide Sharp with their account of the incident. (1/27/00 Sharp Statement). When Jordan was then informed that he would be suspended for his disruptive and belligerent behavior, he protested, insisting that he had only shoved Martin because Martin had pushed him first. Jordan then picked up the phone and called Plant Manager Jack Chebra, to complain that he was being "harassed" and "set up." (Jordan Dep. at 130–131; 1/27/00 Sharp Statement; Chebra Aff. at ¶¶ 34–35). When Jordan was finished speaking with Chebra, Sharp informed Jordan and Martin that they were both being suspended pending termination. (Jordan Dep. at 131; 1/27/00 Sharp Statement; Chebra Aff. at ¶ 38).

Jordan was subsequently notified of his termination by letter dated February 1, 2000, which read as follows:

> You were placed on suspension for the dates 1/28/00, 1/29/00, and 1/31/00, due to your continued violation of work rule number IV, V, and X which addresses [sic] Not interfere, Health and Safety and Morals.[5]

> A review of your completed work history has been made. Since no extenuat-

---

5. Work Rule IV, which is entitled "Not Interfere," provides, in pertinent part, that "[a]n employee shall not restrict production or interfere with others in the performance of their jobs" and "[a]n employee shall not refuse nor fail to follow a supervisor's instructions." (Def.'s Br. at Ex. W). Work Rule V, which relates to rules governing the "health and safety" of employees, instructs that "[e]mployees are expected to work safely and avoid any conduct which tends to create a health or safety hazard" and prohibits "fighting or threatening bodily harm in any manner." (*Id.*). Work Rule X cautions employees that the use of "[o]bscene or abusive language will not be tolerated." (*Id.*).

ing circumstances have been found, your employment with the Company is being terminated as of this date.

(Termination letter dated 2/1/00, attached to Def.'s Br. as Ex. V). After filing an administrative complaint and receiving a right to sue letter from the Equal Employment Opportunity Commission, Plaintiff instituted an action in this Court on July 12, 2001 alleging that he had been the victim of illegal racial discrimination.

### III.

■ In a case such as this where plaintiff has not produced direct evidence of discrimination, race discrimination claims under Title VII or New Jersey LAD are analyzed under the now familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) The *McDonnell Douglas* analysis proceeds in three stages. First, the plaintiff bears the initial burden of establishing a *prima facie* case of unlawful racial discrimination. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994). To establish a prima facie case, plaintiff must prove: (1) that he is a member of a protected class; and (2) that he suffered some form of adverse employment action; (3) under circumstances that give rise to an inference of unlawful discrimination. *See Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318–319 (3d Cir.2000); *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 356 (3d Cir.1999).

If the plaintiff succeeds in making a prima facie showing, the burden of production then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's termination. *Id.* Finally, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not his true reasons, but were a pretext for discrimination. *Texas Dep't of Community Affairs*

*v. Burdine*, 450 U.S. 248, 252–253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (citations omitted). While the burden of production may shift, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

■ For purposes of this motion, Defendant does not contend that Plaintiff has failed to carry his burden of establishing a prima facie case. The Court will therefore begin its analysis by determining whether, assuming Plaintiff can make out a prima facie case of race discrimination, Defendant has satisfied its burden of production by articulating a legitimate, non-discriminatory reason for Plaintiff's termination. *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir.1997) (*en banc*). In order to satisfy its "relatively light" burden of production, Defendant need only "introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes*, 32 F.3d at 763 (3d Cir.1994).

■ Defendant maintains that the decision to terminate Plaintiff's employment was based on the series of previously described incidents which, according to Defendant, demonstrate Plaintiff's "consistent pattern of insubordinate, disruptive and threatening behavior despite repeated counseling, discipline and employer-sponsored therapy." Defendant's concerns about Plaintiff's belligerent, disruptive, and, at times, threatening behavior toward his supervisors and fellow employees were communicated to him on several occasions and cited in the notice of termination as reasons for his discharge. Defendant's have thus clearly satisfied their burden of production. *See, e.g., Homan v. Trump Taj Mahal Casino*, 1997 WL 769405 at *11 (D.N.J.1997) (Irenas, J.), *aff'd*, 178 F.3d

1279 (3d Cir.1999) (concluding that employer's determination, based on numerous disciplinary notices, that plaintiff was "incapable of getting along with her fellow employees, was insubordinate to her superiors and was disruptive to customers and co-workers," satisfied employer's burden to articulate a legitimate, non-discriminatory reason for plaintiff's termination); *see also Varela v. Philadelphia Neighborhood Housing Services, Inc.*, 68 F.Supp.2d 575, 582 (E.D.Pa.1999) (evidence that plaintiff's termination was based on documented incidents of insubordination toward supervisors and a repeated failure to comply with company work rules was sufficient to rebut plaintiff's prima facie case).

■ Once defendant has proffered legitimate, non-discriminatory reasons for Plaintiff's termination sufficient to rebut his prima facie case, the burden rebounds to Plaintiff to show by a preponderance of the evidence that the employer's proffered reasons are merely a ruse or pretext for illegal racial discrimination. "Pretext cannot be established based on speculation and mere conclusory allegations." *Boykins v. Lucent Technologies, Inc.*, 78 F.Supp.2d 402, 413 (citing *Billet v. CIGNA Corp.*, 940 F.2d 812, 816 (3d Cir.1991)) ("Merely reciting that [race] was the reason for the decision does not make it so."), *abrogated on other grounds by, St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 517–18, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Rather, in order to defeat summary judgment at this stage, Plaintiff must point to "some evidence, direct or circumstantial, from which a reasonable finder of fact could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764; *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1067 (3d Cir.1996) (en banc). Because Plaintiff has failed to point to competent evidence which would fall into either of these categories, the Court will enter summary judgment in favor of Defendant AllGroup Wheaton.

■ In order to satisfy the first prong, Plaintiff must adduce evidence "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Fuentes*, 32 F.3d at 765. Plaintiff must "demonstrat[e], through admissible evidence, that the employer's articulated reason was not merely wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Jones v. School District of Philadelphia*, 198 F.3d 403, 413 (3d Cir.1999) (citing *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir.1997)); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("It is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.").

■ The summary judgment record is devoid of any evidence which would tend to cast doubt on Defendant's stated reasons for discharging Plaintiff. Plaintiff points to no competent evidence in the record, beyond his own conclusory accusations and suspicions, from which a factfinder could reasonably conclude that Defendant's disciplinary actions were wrong or unreasonable, let alone motivated by racial animus. Indeed, Defendant does not dispute his supervisor's accounts of the incidents of belligerent and insubordinate behavior described in the various disciplinary reports which served as the basis for his termination, but rather merely insists that all such incidents were provoked by persons whom he dismissively labels as "racists."

■ Alternatively, a plaintiff may avoid summary judgment by producing evidence of the second variety showing "that the employer has previously discriminated against the plaintiff, that the employer had previously discriminated against other persons with the plaintiff's protected class, or that the employer has treated more favorably similarly situated persons not within the protected class.'" *Jones*, 198 F.3d at 413 (citing *Simpson v. Kay Jewelers*, 142 F.3d 639, 649 (3d Cir.1998)). However, Plaintiff has not produced evidence sufficient to support a reasonable inference that race was a substantial factor motivating Defendant's decisions to discipline and eventually to terminate him.

■ Plaintiff alleges that he was unfairly singled out and harassed by his white supervisors on account of his race. As evidence of this, Plaintiff points to the incident on June 3, 1999, in which his white shift supervisor, Nancy Davis, reprimanded him for sitting down while polishing molds but ignored the rest of his co-workers whom he alleges were also sitting down or kneeling against stools at the time. Jordan acknowledges, however, that, with one exception, all of the other members of his crew on duty at the time were also African–American. Thus, while Davis's decision to reprimand Jordan may have been unfair or perhaps even motivated by her personal dislike for him, the surrounding circumstances do not support an inference that he was singled out because of his race. *See Walton v. Mental Health Association of Southeastern Pa.*, 1997 WL 717053 (E.D.Pa. Nov. 17, 1997), *aff'd* 168 F.3d 661 (3d Cir.1999) ("employers are entitled to make employment decisions which are unpopular, unwise, and even unjust as long as they do not do so for discriminatory reasons") (citing *Rhett v. Carnegie Ctr. Assoc.*, 129 F.3d 290, 297 (3d Cir.1997)).

■ Plaintiff further asserts, more generally, that white employees who had been involved in verbal and physical altercations with supervisors and fellow employees were not terminated and that such differential treatment is evidence of intentional racial discrimination. He recounts witnessing two fights between white co-workers, one in which co-worker Matt Kiley screamed at a secretary and another involving a physical altercation between two fellow mold makers. According to Plaintiff, none of the employees involved in these incidents were terminated for their conduct. However, because there is no evidence in the record that any of the individuals involved in these workplace disputes had a disciplinary record comparable to his own, this anecdotal evidence that past quarrels between white employees resulted in less severe punishment for those involved fails to support an inference of intentional racial discrimination. *See Osuala v. Community College of Philadelphia*, 2000 WL 1146623 at *7 (E.D.Pa. Aug. 15, 2000) *aff'd* 259 F.3d 717 (3d Cir. 2001) (observing that unless the quantity and quality of comparator's misconduct is very similar to that of plaintiffs, evidence that the specific incidents of other employee misconduct resulted in less severe disciplinary action is insufficient to raise the specter of invidious racial discrimination).

Jordan also points to Wheaton's failure to fire Bob Martin, the white co-worker who he alleges to have initiated the January 27, 2000 shoving incident which preceded his termination, as further evidence that "white worker's [were permitted to] do what they please and [were] left alone by management." (Jordan Dep. at 85). However, here again, there is no evidence in the record that Martin, who like Jordan was suspended for three days for his involvement in the scuffle, was involved in any prior misconduct similar to that documented in Jordan's personnel file.

Finally, as further support for his allegations that Wheaton's white employees received preferential treatment, Plaintiff contends that white employees regularly gambled during work hours but were not disciplined or fired for such conduct. However, there is no evidence in the summary judgment record that either Plaintiff or other African–American employees were ever disciplined based on their participation in workplace gambling activities. Indeed, according to Plaintiff, Plaintiff and his co-workers, both black and white alike, regularly gambled at work with impunity.

## IV.

Accordingly, because the Court concludes that Plaintiff has offered insufficient evidence from which a reasonable factfinder could conclude that Defendant's proffered reasons for terminating Plaintiff were merely a pretext for racial discrimination, the Court will deny Plaintiff's cross-motion for summary judgment and will enter summary judgment in favor of Defendant AllGroup Wheaton. The Court will enter an appropriate order.