**MAIN EVENTS PRODUCTIONS, L.L.C. and New Jersey Sports Productions, Inc., Plaintiffs,**

v.

**Jeff LACY, John Does (fictitious entities) and Richard Roes (fictitious entities), Defendants.**

**Civil Action No. 2:02–CV–3028 (DRD).**

United States District Court, D. New Jersey.

Oct. 28, 2004.

---

See, also, 220 F. Supp.2d 353.

Patrick C. English, Esq., Dines and English, L.L.C. Clifton, NJ, Laurence B. Orloff, Esq., Orloff, Lowenbach, Stifelman & Siegel, P.A., Roseland, NJ, for Plaintiffs Main Events Productions, L.L.C. and New Jersey Sports Productions, Inc.

Judd Burstein Esq., Judd Burstein, P.C., New York City, David A. Picon, Esq., Proskauer Rose LLP, Newark, NJ, for Defendant Jeff Lacy.

## OPINION

DEBEVOISE, Senior District Judge.

Presently before the court is a motion for partial summary judgment, submitted by promoter Main Events and its parent company, New Jersey Sports Productions (collectively, "Main Events" or "Plaintiffs"), requesting the court to hold that Main Events fully complied with the disclosure requirements of the Muhammad Ali Boxing Reform Act, 15 U.S.C. § 6301 et seq., (the "Ali Act"). For the reasons set forth herein, the court will deny the motion.

## I. BACKGROUND

### A. Facts

Pursuant to § 6307e(b) of the Ali Act, as a "promoter"[1] Main Events was required to give disclosures concerning its compensation to the "boxer it promotes."[2] Instead of making the disclosures directly to the boxer Jeff Lacy ("Lacy" or "Defendant"), Main Events provided the required disclosures to Lacy's "manager,"[3] Shelly Finkel.

Between autumn 2000 and early 2001, Shelly Finkel recruited boxers who had competed in the 2000 Olympics, including Lacy. Recruitment efforts were targeted at the Olympic fighters because Finkel and Showtime Networks, Inc. ("Showtime") were in the process of establishing an amateur boxing series that would feature the Olympians. Finkel designated Main Events as the promoter of this series (Schalk Aff. Ex. D at 15–16).

Finkel and Lacy entered a management agreement on or about October 30, 2000 (the "Management Agreement"), whereby Finkel agreed to become Lacy's manager. Among Finkel's specified obligations were, *inter alia*, to "[r]epresent [Lacy] and act as his negotiator to fix and agree upon the terms governing all manner of disposition, use, employment and exploitation of [Lacy's] services, talents and the products thereof ... [and] consult, negotiate terms and contract with boxing promoters in connection with [Lacy's] boxing contests and/or exhibitions...." (Schalk Aff. Ex. A at ¶ 2.) The Management Agreement provided that in exchange, Lacy would pay Finkel ten percent of any and all remuneration that Lacy would receive for participating in professional boxing contests, and that this would constitute full compensation for the services which Finkel would render.

In actuality, Finkel did not receive any compensation from Lacy, but instead received a more lucrative compensation package from Showtime that was to be calculated at a percentage of the rights fee paid to Main Events. (Schalk Aff. Ex. D. at 24–25, 55.) Finkel testified during his deposition that Pat English—who was outside counsel to Main Events and was involved in the negotiations with Showtime—was aware that Finkel would be receiving his compensation from Showtime because Finkel had discussed this compensation arrangement with English and Showtime. (*Id.* at 55–56, 68–69.) Finkel also asserted that Lacy and Wilkes had knowledge of and agreed to this arrangement. (*Id.* at 24–25.) Wilkes testified at a hearing before the court that prior to this action, he did not know the amount of compensation that Finkel would be receiving from Showtime. (Schalk Aff. Ex. E at 375.)

On or about December 1, 2000, Lacy entered into a Promotion Agreement (the "Promotion Agreement") with Main Events. Pursuant to the Promotion Agreement, Main Events would serve as Lacy's exclusive promoter and would pay Lacy minimum guaranteed purses for participating in a specified minimum number of fights during each year of the life of the Promotion Agreement. During the negotiation of the Promotion Agreement and at all times relevant to this action, Lacy was

1. "Promoter" is defined as "the person primarily responsible for organizing, promoting, and producing a professional boxing match." 15 U.S.C. § 6301(9).

2. "Boxer" is defined as "an individual who fights in a professional boxing match." 15 U.S.C. § 6301(1).

3. "Manager" is defined as "a person who receives compensation for service as an agent or representative of a boxer." 15 U.S.C. § 6301(5).

represented by his manager, Finkel, and by his legal counsel, James Wilkes, Esq. Apparently, although Main Events did not inform Lacy that he would be part of the Showtime package when Lacy signed the Promotion Agreement,[4] Wilkes knew that Finkel and Main Events were negotiating an arrangement with Showtime. (Schalk Aff. Ex. D at 22–23.)

Main Events faxed to Finkel the written Ali Act disclosures, which showed the compensation received by Main Events in connection with Lacy's fights. However, Main Events did not give any disclosures directly to Lacy. Some of the cover letters directed Finkel to show the disclosure forms to Lacy. In his deposition, Finkel acknowledged that he received and signed the disclosure forms on Lacy's behalf, but he did not recall transmitting to or reviewing with either Lacy or Wilkes the disclosure materials. (Schalk Aff. Ex. D at 52–53, 65–66.) Indeed, Finkel testified that he usually tore up the disclosure materials after sending the signed forms back to Main Events. *Id.*

Main Events sent the Ali Act disclosures to Finkel after the fights had already occurred. (English Aff. Ex. D; *see also* Schalk Aff. Ex. D at 62–64.) Main Events asserts that these disclosure forms were merely written confirmation of information that Finkel already had. Each package of disclosure materials included a document entitled "Required Disclosures by a Promoter to a Boxer," which prefaced an itemized list with this explanatory note: "As the Promoter of the above named event I have received the following compensations or considerations resulting from your match." (English Aff. Ex. D.) The following list summarizes the dates when the written Ali Act disclosures were apparently faxed to Finkel and the dates of the corresponding matches:

| Date of disclosure | Date of match |
|---|---|
| 3/6/01 | 3/2/01 |
| 10/1/01 (disputed)[5] | 5/19/01 |
| 10/17/01 | 10/13/01 |
| 2/21/02 | 2/16/02 |
| 4/1/02 | 3/30/02 |

(English Aff. Ex. D; *see also* Schalk Aff. Ex. D at 62–64.)

Main Events asserts—and Lacy does not dispute—that giving the disclosures to the boxer's manager was pursuant to Main Events's preexisting practice, which was developed after a seminar on the Ali Act sponsored by the Association of Boxing Commissions (the "ABC"). Patrick C. English, Esq. drafted a memorandum to Main Events, dated October 10, 2000, which discussed certain key provisions of the Ali Act, including the disclosure requirements. Although both the past and then-current president of the ABC were copied on this memorandum and were requested to suggest corrections to the understanding of the Ali Act reflected in the memorandum, they did not respond to this request.

In June 2002, Lacy attempted to terminate the Promotion Agreement, and Main Events brought suit[6] for breach of con-

---

4. According to Main Events's COO at that time, Gary Shaw, such disclosure would have been the manager's obligation. (Schalk Aff. Ex. C at 90.)

5. Lacy contends that Main Events sent the disclosure in connection with the May 19, 2001 fight on October 1, 2001, whereas Main Events argues that the disclosures were merely "re-sent" on October 1, 2001 but does not provide the date of original transmission to Finkel. Rather, in its reply letter brief, Main Events simply claims that the disclosure "was originally prepared on behalf of Main Events and signed on its behalf on May 21, 2001." (Pl.'s Reply Letter Br. at 2.)

6. Plaintiffs originally commenced this action in New Jersey Superior Court, Bergen County, Chancery Division, but Lacy removed the action to this court on June 25, 2002.

tract, seeking, *inter alia,* injunctive relief and damages. On June 26, 2002, Lacy filed an Answer. Soon thereafter, the parties made cross-motions for summary judgment, each asserting that the language of the Promotion Agreement unambiguously supported their respective positions. In an Order dated September 4, 2002, the court denied Main Events's application for a temporary restraining order and a preliminary injunction. The court also denied both parties' summary judgment motions after finding that the language of the Promotion Agreement was ambiguous.

### B. The Instant Motion

At issue in the instant motion is Lacy's counterclaim under the Ali Act, in which Lacy alleges that Main Events violated the Ali Act by failing to disclose directly to Lacy the amount of compensation that Main Events would receive for each match fought by Lacy.[7] In support of its motion for summary judgment, Main Events contends that it fully complied with the Ali Act's disclosure requirements by providing the disclosures to Finkel, Lacy's manager and agent.

### C. Summary Judgment Standard

Summary judgment will be granted if the record establishes that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R.CIV.P. 56(c).

Rule 56(c) imposes a burden on the moving party simply to point out to the district court that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has met this burden, the burden then shifts to the opposition to "set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e). The evidence need not be in a form that would be admissible at trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Further, a party may not simply "replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Rather, she must "set forth specific facts showing that there is a genuine issue for trial." Rule 56(e).

At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* at 247, 106 S.Ct. 2505. In determining whether there exists a material issue of disputed fact, however, the facts and the inferences to be drawn from the facts are to be viewed in the light most favorable to the nonmoving party. *Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986).

---

7. By order dated December 18, 2003, the court granted Lacy leave to file an Amended Answer. The Amended Answer alleged the following counterclaims against Main Events:

fraud, equitable fraud, negligent misrepresentation, and violation of the Ali Act. Only the counterclaim alleging a violation of the Ali Act is in issue here.

## II. DISCUSSION

### A. The Ali Act's economic injury requirement

■ The Ali Act creates a private right of action for a boxer who has suffered economic injury as a result of a violation of the Ali Act. 15 U.S.C. § 6309(d). Recovery may include money damages, court costs, and reasonable attorneys' fees and expenses. *Id.* The threshold issue is whether Lacy has alleged an economic injury that resulted from an alleged violation of the Ali Act.

Lacy claims that he suffered an economic injury which arose as a result of Main Events's violation of the disclosure requirements in § 6307e(b). More specifically, Lacy contends that Main Events's failure to disclose its compensation directly to Lacy, which perpetuated Lacy's ignorance of the financial details associated with his fights, harmed his financial interests by allowing Main Events to significantly underpay him. If Main Events had given the disclosures directly to Lacy, who would thereby have been informed of the amount of Main Events's compensation, Lacy asserts that he would not have agreed to fight for $30,000 per fight.

In contrast, Main Events argues that Lacy suffered no harm from Main Events's failure to give financial disclosures directly to Lacy. First, Main Events asserts that because Lacy essentially complains about Finkel's compensation from Showtime rather than any compensation received by Main Events, the lack of direct disclosure would not have caused any harm to Lacy because the required disclosures would not have reflected Finkel's compensation. Second, in its Reply Letter Brief, Main Events asserts that Lacy made an egregious misrepresentation by

suggesting that the entire rights fee paid by Showtime to Main Events was attributable to Lacy. Main Events explains that the Showtime fees were paid for the entire card, which included bouts between boxers who were more prominent and well-known than Lacy, and not solely for Lacy's bout. When put in this context, Main Events argues that it did not underpay Lacy.

The court finds that Lacy has provided some evidence from which it could be inferred that he suffered economic injury arising from Main Events's alleged violation of the Ali Act's disclosure requirements. *See Frazier v. Turning Stone Casino*, 254 F.Supp.2d 295, 303 (N.D.N.Y. 2003) (finding no subject matter jurisdiction under the Ali Act because plaintiff was not a "boxer" and did not allege an injury arising as a result of a violation of any provision of the Act). Main Events's arguments do not convince the court otherwise. First, Main Events contends that the real issue concerns Finkel's rather than Main Events's compensation. Lacy's Memorandum of Law does indeed suggest that Finkel's arrangement with Showtime may have compromised his role as manager.[8] However, this argument does not address or refute Lacy's allegation that if he had received disclosures concerning the amount of Main Events's compensation, he would have known that he was being underpaid and would have had better information to negotiate his purses. Second, Main Events's argument—i.e., the fees paid by Showtime to Main Events cannot be attributed to Lacy alone—concerns the amount of damages to which Lacy might eventually entitled. The amount of Main Events's compensation might indeed be attributable to other fighters, and Lacy might very well not be entitled to receive

---

**8.** "... Finkel had no real incentive to negotiate for greater purses for Lacy. This is so, because Finkel's fee was being paid by Show- time ..., not Lacy's actual purse." (Def.'s Mem. of Law at 6–7.)

any damages, but this is not the issue here. The issue is whether Lacy has provided some evidence from which it could be inferred that he suffered economic injury. Based upon the record and at this stage of the litigation, Lacy's claim that he suffered economic injury is not so speculative as to warrant summary judgment in favor of Main Events.

### B. The Ali Act's disclosure requirements

#### 1. Disclosure to the "boxer"

█ Main Events concedes that it provided the required disclosures only to Finkel, but argues that such disclosure satisfied the Ali Act's disclosure requirements because Finkel was Lacy's manager. Therefore, the first issue with respect to the disclosure requirements is whether the disclosure provision, 15 U.S.C. § 6307e(b), is satisfied by giving the disclosure to the boxer's manager rather than directly to the boxer himself.

The Ali Act provides in relevant part:

A promoter shall not be entitled to receive any compensation directly or indirectly in connection with a boxing match until it provides to *the boxer it promotes—*

(1) the amounts of any compensation or consideration that a promoter has contracted to receive from such match;

(2) all fees, charges, and expenses that will be assessed by or through the promoter on the boxer pertaining to the event, including any portion of the boxer's purse that the promoter will receive, and training expenses; and

(3) any reduction in a boxer's purse contrary to a previous agreement between the promoter and the boxer or a purse bid held for the event.

15 U.S.C. § 6307e(b) (emphases added). Because no relevant caselaw provides guidance on whether disclosure to the boxer's manager is adequate, the court will

"begin with the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *E.g., Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980); *see also Prisco v. Talty,* 993 F.2d 21, 24 (3d Cir.1993) ("We note that the first maxim of statutory construction is that a statute's facial language is conclusive.") (citation omitted).

The Ali Act's facial language conclusively states that a promoter must provide the financial disclosures to the "boxer it promotes." There is nothing ambiguous in requiring the promoter to make the disclosures to the boxer. The Ali Act does not include "manager" in the definition of "boxer," nor does it provide a choice to the promoter to make disclosures to either the boxer, the manager or the boxer's agent.

Main Events argues that in passing the Ali Act, Congress did not intend to override the principle derived from agency law that an agent's knowledge, obtained during the course of his duties, is imputed to the principal. However, this argument fails for at least two reasons. First, the plain language of the Ali Act governs, and Congress mandated that the disclosures must be provided to the "boxer." Second, to require a promoter to provide the disclosures directly to the boxer does not represent a radical departure from agency law. The Ali Act does not provide that knowledge of a manager is never imputed to a boxer, but merely states that the mandatory disclosures must be made to the "boxer."

In addition to the plain language of § 6307e(b), Congressional intent evinces a strong rationale for ensuring that the boxer receives the mandatory disclosures

directly. Congress passed the Ali Act because it found "[i]t necessary and appropriate to establish national contracting reforms to protect professional boxers and prevent exploitive business practices ..." Muhammad Ali Boxing Reform Act, Pub.L. No. 106–210. The Ali Act attempts to prevent a particular exploitive business practice—i.e., actual and/or potential collusion between manager and promoter—by requiring a firewall between the financial interests of manager and promoter. *See* 15 U.S.C. § 6308(b). If the boxer does not receive the promoter's financial disclosures directly, the boxer would thereby lose some of the protection that the Ali Act was intended to provide. Without receiving the disclosures directly, there is the possibility—realized in this case—that the boxer will never receive or know the amount of his promoter's compensation. This lack of knowledge could harm the boxer in several ways, including preventing the boxer from knowing his market value, being able to negotiate effectively for his purse, and providing greater opportunity for the promoter and manager to collude, to the boxer's detriment, with respect to the finances of a particular fight.

In this case, it is undisputed that Lacy did not receive the required disclosures from either Main Events or Finkel, and thus did not receive the protection that the Ali Act intended to provide. Finkel admitted that he never showed the disclosures to Lacy and that he usually tore up the disclosures after he signed and returned the acknowledgment forms to Main Events.

Even if disclosure to Finkel were adequate under the Ali Act—which it is not—Finkel's knowledge of the financial disclosures could not be imputed to Lacy. Main Events had reason to question Finkel's loyalty to Lacy because it was aware of Finkel's lucrative arrangement with Showtime.[9] Therefore, because Main Events had reason to question whether Finkel would show the disclosures to Lacy, it cannot impute knowledge of the disclosures to Lacy. *See Resolution Trust Corp. v. Moskowitz,* Civil Action No. 93–2028, 1994 U.S. Dist. LEXIS 20553, at *19 (D.N.J. Aug. 16, 1994) ("rule of imputation is 'invocable to protect the innocent, never to promote an injustice' ") (citation omitted).

### 2. The timeliness requirement

■ The second issue with respect to the Ali Act's disclosure requirements is the timeliness of the disclosures. Section 6307e(b) states in relevant part that "a promoter shall not be entitled to receive any compensation ... *until* it provides ... [the required disclosures]" *See* 15 U.S.C. § 6307e(b) (emphasis added). Without the guidance of relevant caselaw to interpret this provision, the court will examine the language of the statute as well as legislative purpose. *See Echols v. Pelullo,* Civ. Action No. 03–1758, 2003 WL 21340274, at *2, 2003 U.S. Dist. LEXIS 9583, at *4 (E.D. Pa. June 4, 2003) (basing its findings—which are not relevant here—solely

---

9. Because of Finkel's arrangement with Showtime, Finkel had little, if any, incentive to negotiate vigorously on Lacy's behalf with Main Events. The Management Contract between Finkel and Lacy specified that Finkel's compensation was to be ten percent of all remuneration that Lacy would receive for participating in fights. (Schalk Aff. Ex. A at ¶ 3.) Structuring the manager's compensation

in this way, such that it is dependent on the boxer's earnings, provides a major incentive for the manager to negotiate in the boxer's best interests with the promoter. However, in this case Finkel did not have such an incentive because Showtime, not Lacy, paid Finkel fees that were not dependent on Lacy's earnings.

on the court's interpretation of the language used by Congress in § 6307e(b)(1)). Webster's Ninth New Collegiate Dictionary defines "until" as "till such time as." By substituting these definitions into the language of the statute, the meaning of the timeliness requirement is clear: a promoter shall not be entitled to receive any compensation till such time as it provides the required disclosures. The plain language of § 6307e(b) requires the promoter to disclose its compensation to the boxer before the promoter is entitled to receive any compensation. A contrary interpretation would render meaningless the protection Congress intended to offer by requiring disclosures to be given in a timely manner.

The timeliness requirement is material in order to further the purpose of "protect[ing] the rights and welfare of professional boxers ... by preventing certain exploitive, oppressive, and unethical business practices." Muhammad Ali Boxing Reform Act, Pub.L. No. 106–210, 114 Stat. 322. *See also* 15 U.S.C. § 6302(1) (stating that one purpose is to "improve and expand the system of safety precautions that protects the welfare of professional boxers"). Among the protections that Congress sought to provide to a boxer is a more level and transparent basis for negotiating the terms of the boxer's compensation. *See* Pub.L. No. 106–210, 114 Stat. 322 ("It is necessary and appropriate to establish national contracting reforms to protect professional boxers and prevent exploitive business practices ...."). Requiring a promoter to provide financial disclosures before a promoter is entitled to compensation helps to ensure that the promoter will promptly provide information. Providing such information in a timely manner would help the boxer to determine more accurately his market value and prevent "exploitive, oppressive, and unethical business practices" from being perpetrated upon the boxer. The information might be

particularly important when the boxer negotiates the amount of the purse he should receive.

Lacy contends that Main Events did not comply with the timeliness requirement because it sent the Ali Act disclosures to Finkel after Main Events had received its licensing fees from Showtime. As support, Lacy cites the Ali Act disclosures that were apparently faxed to Finkel after the fights had occurred and contained the statement: "As the Promoter of the above named event [Main Events has] received the following compensations or considerations resulting from [the boxer's] match." (Schalk Aff. Ex. K, English Aff. Ex. D.) In contrast, Main Events suggests that its disclosures were timely and, because "the disclosure forms were only written confirmation of information Finkel already had" (Pl.'s Reply Letter Br. at 3), the fax dates do not indicate the dates on which Finkel originally received the disclosures. (*Id.* at 2–3.) Because both parties have offered evidence disputing the factual issue of whether Main Events provided the required disclosures before or after receiving compensation, the court cannot grant summary judgment for Main Events with respect to Lacy's Ali Act claim.

### III. CONCLUSION

Main Events violated the disclosure requirements by giving the disclosures to Finkel instead of directly to Lacy. Main Events's motion for partial summary judgment will be denied also because there is a genuine issue of material fact with respect to whether Main Events complied with the timeliness requirement in § 6307e(b).