**MELROSE HOTEL COMPANY,**
Plaintiff,

v.

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY,**
Defendant.

**Civil Action No. 05–3467.**

United States District Court,
E.D. Pennsylvania.

April 19, 2006.

490

Brian T. Himmel, Reed Smith, LLP, Pittsburgh, PA.

Thomas J. McGarrigle, Philadelphia, PA, for Plaintiff.

Alan Stuart Miller, Picadio Sneath Miller & Norton, Bridget M. Gillespie, Pittsburgh, PA, Charles E. Spevacek, Meagher & Geer, Minneapolis, MN, for Defendant and Counter Defendant.

### *MEMORANDUM AND ORDER*

SCHILLER, District Judge.

The Melrose Hotel Company ("Melrose") hired a third-party vendor to send faxes advertising Melrose's hotel rooms to various travel groups. The Travel 100 Group, Inc. ("Travel 100 Group") filed a class action lawsuit ("Travel 100 Complaint") against Melrose in the Circuit Court of Cook County, Illinois. According to the Travel 100 Complaint, Melrose's unsolicited fax advertisements to Class members violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C.

§ 227. Melrose notified its insurance carrier, St. Paul Fire and Marine Insurance Company ("St.Paul"), and requested that St. Paul defend it in connection with the Travel 100 Group litigation. After originally agreeing to defend Melrose subject to a reservation of rights, St. Paul denied coverage. Melrose eventually entered into a settlement agreement with the Travel 100 Group. Thereafter, Melrose filed this action seeking a declaratory judgment that St. Paul must defend and indemnify it in connection with the Travel 100 Group litigation. Presently before the Court are the parties' cross-motions for summary judgment in the declaratory judgment action. For the reasons set forth below, the Court grants St. Paul's motion and denies Melrose's motion.

## I. BACKGROUND

### A. The Insurance Policy

St. Paul issued Policy Number 602NB2947 ("the Policy") to Select 2 Hotel Insurance Group, a risk purchasing group located in Bellevue, Washington. (Summ. J. J.A. Ex. 1 [Insurance Policy].) Melrose is identified as an insured. *(Id.)* The Policy obligates St. Paul to:

> defend any protected person against a claim or suit for injury or damage covered by this agreement. We'll have such right and duty even if all of the allegations of the claim or suit are groundless, false, or fraudulent. But we won't have a duty to perform any other act or service.

*(Id.)* At issue in this case are the Policy's "advertising injury" and "property damage" provisions. The Policy covers, *inter alia*, "advertising injury liability" as follows:

> We'll pay amounts any protected person is legally required to pay as damages for covered advertising injury that:

> results from the advertising of your products, your work, or your completed work; and

> is caused by an advertising injury offense committed while this agreement is in effect.

*(Id.)* An "advertising injury" means:

> injury, other than bodily injury or personal injury, that's caused by an advertising injury offense.

*(Id.)* The Policy defines an "advertising injury offense" as any of the following:

> · Libel, or slander, in or with covered material.

> · Making known to any person or organization covered material that disparages the business, premises, products, services, work or completed work of others.

> · Making known to any person or organization covered material that violates a person's right to privacy.

> · Unauthorized use of any advertising idea or advertising material, or any slogan or title, of others in your advertising.

*(Id.)* "Covered material" is:

> any material in any form of expression, including material made known in or with any electronic means of communication, such as the Internet.

*(Id.)* The Policy also covers "bodily injury and property damage liability." The Policy states:

> We'll pay amounts any protected person is legally required to pay as damages for covered bodily injury or property damage that:

> · happens while this agreement is in effect; and

> · is caused by an event.

*(Id.)* The Policy defines "property damage" as:

· physical damage to tangible property of others, including all resulting loss of use of that property; or

· loss of use of tangible property of others that isn't physically damaged.

(*Id.*) The Policy defines an "event" as:

an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

(*Id.*)

### B. Melrose's Faxed Advertisements and the Travel 100 Group Litigation

The Court turns to the facts surrounding Melrose's advertisements and the Travel 100 Group litigation. At the time the Policy was in effect, Melrose was a hotel located in New York City, owned by Barbizon Hotel Associates, L.P. and operated by MHC Barbizon, L.P. (Summ. J. J.A. Exs. 16 [Lahood Dep.] at 13–14 & 15 [Kelly Dep.] at 27–28, 33.) Melrose entered into an agreement with Captaris MediaLinq ("Captaris"), whereby Captaris would broadcast faxes to travel agents in locations selected by Melrose. (Summ. J. J.A. Exs. 4 [Service Agreement], 5[Sample of Travel Express Broadcast Requests] & 16 at 67; *see also* Melrose Mem. of Law in Supp. of Mot. for Summ. J. at 4.) Under the Service Agreement, Melrose warranted that it would "comply with all applicable laws and regulations relating to its use of the Services, including . . . laws and regu-

lations relating to sending unsolicited communications." (Summ. J. J.A. Ex. 4.)

From February 13, 2003 through July 30, 2003, Captaris sent 270,958 faxes on behalf of Melrose, and 165,083 of those faxes were received. (Melrose Mot. for Summ. J. Ex. C [Captaris Summary of Faxes Sent/Received].) The faxes provided room rates for the Melrose Hotel as well as the phone number, mailing address and web address for Melrose.[1] (Summ. J. J.A. Ex. 5 [Samples of faxes sent on behalf of Melrose].) Captaris invoiced the Melrose Hotel for sending the faxes, but MHC Barbizon paid the bills. (Summ. J. J.A. Ex. 6 [Invoices and payment stubs].) MHC Barbizon paid only for those faxes actually received by the intended recipient. (Summ. J. J.A. Ex. 16 at 92.)

On July 29, 2003, the Travel 100 Group filed a class action lawsuit in the Circuit Court of Cook County, Illinois.[2] (Summ. J. J.A. Ex. 2.) The Travel 100 Complaint alleged that Melrose caused an advertisement to be faxed to Travel 100 as part of a mass broadcast of unauthorized faxes, without prior express invitation or permission. (*Id.* ¶¶ 6–8.) According to the Travel 100 Complaint, the faxes shifted the cost of advertising Melrose's products onto Class members and converted the toner and paper belonging to Class members to Melrose's use.[3] (*Id.* ¶ 10.)

The Travel 100 Complaint contains three counts. The Travel 100 Group asserts that

---

1. Although the majority of the faxes advertised the Melrose Hotel located in New York, some advertised the Melrose Hotel in Washington, D.C. (Melrose Mem. of Law in Supp. of Mot. for Summ. J. at 5 n. 7.)

2. An Amended Class Action Complaint was filed on January 20, 2006. (Melrose Mot. for Summ. J. Ex. A.) The claims contained in the two Complaints are nearly identical, with the Amended Complaint naming additional Defendants. (*Compare id. with* Summ. J. J.A. Ex.2.)

3. By Order dated January 9, 2006, the Circuit Court of Cook County granted preliminary approval of a settlement in the case. (Melrose Mot. for Summ. J. Ex. D.) By Order dated January 30, 2006, the Circuit Court of Cook County conditionally certified a settlement class. (Melrose Mot. for Summ. J. Ex. E.) A fairness hearing is scheduled for June 1, 2006. (*Id.*)

Melrose violated the TCPA, which makes it unlawful for any person to "use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine." [4] 47 U.S.C. § 227(b)(1)(C) (2002). According to the TCPA, an "unsolicited advertisement" is "any material advertising the commercial availability or quality of any property, goods or services which is transmitted to any person without that person's prior express invitation or permission." *Id.* § 227(a)(4). For each violation, the law allows a private party to recover the greater of the actual monetary loss suffered or $500. *Id.* § 227(b)(3)(B). Willful or knowing violations of the law permit the court, in its discretion, to award treble damages. *Id.* § 227(b)(3).

The Travel 100 Complaint also contains claims for common law conversion and common law trespass to chattels.[5] (Summ. J. J.A. Ex. 2 ¶¶ 20–3 1.) The Travel 100 Group maintains that through Melrose's "wrongful conduct of sending the unsolicited and unauthorized faxes, [Melrose] appropriated to its own use the paper and toner used to print the faxes and used them in such manner as to make them unusable." *(Id.* ¶ 23; *see also id.* ¶ 29.) The Travel 100 Group further asserts that "[Melrose] know [sic] or should have known that its appropriation of the paper and toner, and thereby shifting its advertising costs to [Travel 100] and the class, was wrongful and without authorization." *(Id.* ¶¶ 24, 30.)

### C. Settlement of the Travel 100 Group Litigation

On November 20, 2003, Brian Himmel, Counsel for Melrose, provided formal notice of the Travel 100 litigation and provided a copy of the Travel 100 Complaint to St. Paul. (Summ. J. J.A. Ex. 9 [Nov. 20, 2003 Letter].) By letter dated January 29, 2004, James Zacharski of St. Paul informed Himmel that "St. Paul has no duty under the CGL policy to defend or indemnify Melrose against the allegations in the complaint filed by Travel 100." (Summ. J. J.A. Ex. 10 [Jan. 29, 2004 Letter].) The letter set forth St. Paul's position that the Travel 100 complaint did not seek to recover damages for "bodily injury," "property damage," "personal injury," or "advertising injury" as those terms were defined in the Policy. *(Id.)* Furthermore, even assuming the Travel 100 Group sought damages arising out of such injuries, St. Paul claimed those injuries or damages were not the result of an "event" as defined in the Policy and fell within exclusions outlined in the Policy. *(Id.)* On October 27, 2004, Himmel wrote to Zacharski demanding that St. Paul reconsider its decision not to defend "[i]n light of continuing developments in the caselaw regarding coverage for TCPA claims." (Summ. J. J.A. Ex. 11 [Oct. 27, 2004 Letter].) Zacharski subsequently notified Himmel on December 10, 2004 that St. Paul "now agreed to participate in the defense of Melrose in the Travel 100 Group Inc. lawsuit under a reservation of rights." (Summ. J. J.A. Ex. 12 [Dec. 10, 2004 Letter].)

In an attempt to settle the Travel 100 Group litigation, the Travel 100 plaintiffs made a demand on Melrose, seeking $1.45 million from St. Paul. (Summ. J. J.A. Ex. 13 [Stipulation] ¶ 1.) On December 22, 2004, Zacharski informed Thomas McGar-

---

**4.** The TCPA was amended in July of 2005. The Court uses the pre-amendment TCPA, which was the version of the statute in effect at the time the Travel 100 Complaint was filed.

**5.** By Order dated May 13, 2004, the Circuit Court of Cook County granted Plaintiff's motion to withdraw without prejudice the trespass to chattels claim. (Summ. J. J.A. Ex. 3.)

rigle, also Counsel for Melrose, that McGarrigle was authorized to offer the Travel 100 plaintiffs up to $500,000 to settle the litigation. *(Id.* ¶3.) The same day, McGarrigle offered the Travel 100 Group $1 million to settle the litigation, which included the $500,000 authorized by St. Paul. *(Id.* ¶4.) On December 23, 2004, Class counsel for the Travel 100 Group rejected Melrose's offer and made a counteroffer. *(Id.* ¶5.) On January 11, 2005, Zacharski phoned McGarrigle, leaving him a voicemail message that he wished to discuss the Travel 100 Group case. *(Id.* ¶6.) Shortly thereafter, Zacharski informed Himmel that, in light of recent case law surrounding insurance coverage of TCPA claims, St. Paul was no longer willing to authorize a $500,000 settlement of the Travel 100 Group litigation. *(Id.)* Zacharski also stated that Travel 100 Group's counteroffer constituted a rejection of St. Paul's offer. *(Id.)* McGarrigle also communicated with Class counsel for the Travel 100 Group on January 11, 2005 and advised him that St. Paul withdrew its $500,000 settlement offer. *(Id.* ¶7.) Subsequently, however, the Travel 100 Group agreed that it would settle the Travel 100 litigation for a total of $1 million, including $500,000 to be paid by St. Paul. *(Id.)* Zacharski informed Melrose's counsel that it would not contribute $500,000 to the settlement and that the Class could not accept St. Paul's offer because the counteroffer had acted as a rejection of the offer. *(Id.* ¶8.) On February 1, 2005, Himmel informed St. Paul that the settlement reached between the Travel 100 Group and Melrose provided for a $1.9 million entry of judgment against Melrose and assignment of Melrose's coverage rights should St. Paul refuse to pay $500,000 towards the settlement. *(Id.* ¶10.) Melrose and the Travel 100 Group subsequently memorialized their agreement in a Memorandum of Understanding. (Summ. J. J.A. Ex. 8

[Mem. of Understanding].) St. Paul has refused to participate in the settlement or consent to the settlement agreement between Melrose and Travel 100. (Summ. J. J.A. Ex. 13 ¶14.)

On June 8, 2005, Melrose brought a declaratory judgment action in the Bucks County Court of Common Pleas. The case was removed to this Court, and, following some jurisdictional wrangling, the parties completed discovery and filed cross-motions for summary judgment. The parties' motions require this Court to determine whether Melrose's conduct as alleged in the Travel 100 Complaint potentially falls within the terms of the Policy such that St. Paul has a duty to defend Melrose in connection with the Travel 100 Group litigation. The Court holds that St. Paul has no such duty.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the initial burden of identifying those portions of the record that it believes illustrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party makes such a demonstration, then the burden shifts to the nonmovant, who must offer evidence that establishes a genuine issue of material fact that should proceed to trial. *Id.* at 324, 106 S.Ct. 2548; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Such affirmative evidence—regardless of whether it is direct or circumstantial—must amount to more

than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams v. Borough of West Chester,* 891 F.2d 458, 460–61 (3d Cir. 1989).

When evaluating a motion brought under Rule 56(c), a court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Pollock v. Am. Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). A court must, however, avoid making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *see also Goodman v. Pa. Tpk. Comm'n,* 293 F.3d 655, 665 (3d Cir.2002).

## III. DISCUSSION

### A. Basic Insurance Contract Interpretation Under Pennsylvania Law

■ Before analyzing the terms of the Policy, the Court will set forth basic principles of insurance contract interpretation that will guide its "faxtual" journey. In Pennsylvania, interpreting an insurance contract is generally a function performed by a court, not a jury.[6] *401 Fourth St., Inc. v. Investors Ins. Group,* 583 Pa. 445, 879 A.2d 166, 171 (2005). The initial burden lies with the insured to establish coverage under an insurance policy. *See Butterfield v. Giuntoli,* 448 Pa.Super. 1, 670 A.2d 646, 651–52 (1995); *see also Koppers Co., Inc. v. Aetna Cas. & Sur. Co.,* 98 F.3d 1440, 1446 (3d Cir.1996) ("In Pennsylvania, the insured bears the burden of proving

facts that brings its claim within the policy's affirmative grant of coverage."). The court's task is to unearth the intention of the parties as evidenced by the words used in the insurance policy. *See 401 Fourth St.,* 879 A.2d at 171. The policy must be read as a whole and its meaning must be construed according to its plain language. *Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.,* 193 F.3d 742, 746 (3d Cir.1999); *see also Giancristoforo v. Mission Gas & Oil Prods.,* 776 F.Supp. 1037, 1041 (E.D.Pa.1991) ("The policy must be construed as a whole, not in discrete units."). Words of common usage are to be construed in their natural, plain, and ordinary sense, with a court free to consult a dictionary to inform its understanding of terms. *Madison Constr. Co. v. Harleysville Mut. Ins. Co.,* 557 Pa. 595, 735 A.2d 100, 108 (1999). However, should the policy define certain terms, the court will apply those definitions in construing the policy. *See J.C. Penney Life Ins. Co. v. Pilosi,* 393 F.3d 356, 363 (3d Cir.2004). Courts must not assume that contractual language was chosen carelessly. *401 Fourth St.,* 879 A.2d at 171 (citations omitted).

■ When the language of an insurance policy is clear and unambiguous, a court must enforce that language. *Med. Protective Co. v. Watkins,* 198 F.3d 100, 103 (3d Cir.1999) *(citing Standard Venetian Blind Co. v. Am. Empire Ins. Co.,* 503 Pa. 300, 469 A.2d 563, 566 (1983)). Moreover, a court should read a policy to avoid ambiguities and give effect to all of its provisions. *Watkins,* 198 F.3d at 103; *see also Little v. MGIC Indem. Corp.,* 836 F.2d 789, 793 (3d Cir.1987). However, "if the policy provision is reasonably susceptible to more than one interpretation, it is ambiguous." *Watkins,* 198 F.3d at 103 *(quoting McMillan v.*

---

**6.** The parties have stipulated that Pennsylvania law applies. (Stipulation Regarding Choice of Law.)

State Mut. Life Assurance Co., 922 F.2d 1073, 1075 (3d Cir.1990)); see also Madison Constr., 735 A.2d at 106. If a provision in an insurance policy is ambiguous, it must be construed in favor of the insured and against the insurer. J.C. Penney, 393 F.3d at 363; see also 401 Fourth St., 879 A.2d at 171.

## B. The Duty to Defend

■ At issue here is the insurer's duty to defend, which is broader than the insurer's duty to indemnify. Frog, 193 F.3d at 746. The duty to defend is assessed by comparing the complaint to the policy. See United Servs. Auto Ass'n v. Elitzky, 358 Pa.Super. 362, 517 A.2d 982, 985 (1986) (citations omitted); see also Gene's Rest., Inc. v. Nationwide Ins. Co., 519 Pa. 306, 548 A.2d 246, 246–47 (1988). The duty to defend arises whenever the underlying complaint potentially comes within the scope of the insurance coverage. Frog, 193 F.3d at 746 (citing Erie Ins. Exch. v. Claypoole, 449 Pa.Super. 142, 673 A.2d 348, 355 (1996)); see also State Farm Fire & Cas. Co. v. Dalrymple, 153 F.Supp.2d 624, 627 (E.D.Pa.2001). This rule applies even when the lawsuit is "groundless, false, or fraudulent." Britamco Underwriters, Inc. v. Weiner, 431 Pa.Super. 276, 636 A.2d 649, 651 (Pa.Super.Ct.1994); see also D'Auria v. Zurich Ins. Co., 352 Pa.Super. 231, 507 A.2d 857, 859 (1986) ("It is the face of the complaint and not the truth of the facts alleged therein which determines whether there is a duty to defend."). The factual allegations in the underlying complaint must be taken as true and liberally construed in favor of the insured. Frog, 193 F.3d at 746 (citing Biborosch v. Transamerica Ins. Co., 412 Pa.Super. 505, 603 A.2d 1050, 1052 (1992)). A court is to examine the facts contained in the complaint, not the particular legal theories advanced in the complaint. Donegal Mut. Ins. Co. v. Baumhammers, 893

A.2d 797, 811 (Pa.Super.2006) (citing Mut. Benefit Ins. Co. v. Haver, 555 Pa. 534, 725 A.2d 743, 745 (1999)).

## C. The Policy's Advertising Injury Provisions

### 1. Melrose's contentions

Melrose claims that its actions, as alleged in the Travel 100 Complaint, fall within the Policy's definition of "advertising injury offense," which includes "making known to any person or organization covered material that violates a person's right to privacy." (Melrose's Mem. of Law in Supp. of Summ. J. Mot. at 17–24.) Melrose contends that the Travel 100 Group's TCPA claim is essentially an invasion of privacy claim. (Id. at 17–18.) Melrose asserts that the legislative history of the TCPA makes clear Congress' intent not only to prevent the hassle and cost incurred in receiving unsolicited faxes, but also to protect the privacy rights of those who do not wish to receive unsolicited faxes. (Id.)

The term "privacy" is not defined in the Policy. Melrose argues that the word "privacy" has several definitions and encompasses both the concepts of seclusion and secrecy. (Id. at 19–20, 23.) Therefore, Melrose contends that the term "privacy" is ambiguous and a lay insured could not be expected to know that the term would be limited to St. Paul's narrow definition, which covers only interests in secrecy because the Policy includes the phrase "making known." (Id. at 20.)

According to Melrose, the phrase "making known" refers not only to disclosing content but also to publishing, transmitting, and conveying. (Id. at 20, 23.) That is, as the Court understands Melrose's argument, the phrase "making known" can mean informing persons that Melrose is offering rooms for as low as $169 a night

and can also refer to the act of informing someone of such information, regardless of the information contained in the fax.

Melrose further argues that it could not be expected to read the Policy as requiring that the person to whom the covered material was made known must be different from the person whose privacy rights were violated. *(Id.* at 22–23.) Melrose contends that the phrase "making known to any person or organization covered material that violates a person's right of privacy" could reasonably be understood to include a situation whereby the entity whose privacy rights were violated is the same entity to whom the covered material was made known. *(Id.* at 22.) Accordingly, Melrose's advertisements need not contain information that violates the privacy rights of an entity different from the recipient. Rather, the act of faxing itself can violate an entity's right to privacy and therefore is covered under the Policy.

### 2. St. Paul's contentions

St. Paul, interpreting the same language as Melrose, argues that the plain and unambiguous language of the Policy forecloses coverage under the "advertising injury" portions of the Policy. St. Paul asserts that "making known to any person covered material that violates a person's right of privacy" requires that the covered material's *content* violate a person's right to privacy. (St. Paul's Br. in Supp. of Mot. for Summ. J. at 25–26.) St. Paul also urges this Court to read that phrase in the context in which it appears; the portion of the advertising injury definition relied upon by Melrose is accompanied by three other examples of advertising injury offenses that illustrate that the Policy applies only to the content of the covered material. *(Id.* at 30; St. Paul's Br. in Opp'n to Melrose's Mot. for Summ. J. at 7–8.) Finally, St. Paul notes that the Poli-

cy requires the covered material be made known "to any *person or organization*" but that the covered material must violate "a *person's* right of privacy." (St. Paul's Br. in Supp. of Mot. for Summ. J. at 32 (emphasis in original).) This dichotomy between persons and organizations, according to St. Paul, further demonstrates that the Policy's reach does not extend to the privacy interests implicated by the Travel 100 Complaint.

### 3. The advertising injury legal landscape

Neither the parties nor the Court have uncovered any cases applying Pennsylvania law to determine whether the advertising injury provisions of an insurance policy cover the sending of unsolicited faxes under the TCPA. However, the Court is not operating without guidance. Numerous courts have considered whether violations of the TCPA are covered by insurance policies that include language similar to that found in the Policy, with some courts ruling in favor of coverage and some ruling against coverage.

The Fourth Circuit Court of Appeals has analyzed "advertising injury offense" language virtually identical to that found here. In *Resource Bankshares Corporation v. St. Paul Mercury Insurance Company,* the court applied Virginia law and held that sending unsolicited faxes in violation of the TCPA did not qualify as an advertising injury offense. 407 F.3d 631 (4th Cir.2005). According to the court, because the TCPA sought to remedy some form of privacy invasion, the complaint could be read to imply some type of privacy concern. *Id.* at 639. But that "nominal overlap" did not automatically create an ambiguity, and the relevant policy provision read in context clearly did not cover the type of privacy invasions covered by the TCPA's unsolicited fax

prohibitions. *Id.* at 640–41. The class action complaint in *Resource Bankshares* focused on seclusion privacy, whereas the policy focused on the content of the unsolicited advertisements, implicating privacy interests related to secrecy. *Id.* at 641. Additionally, the court refused to interpret the policy to mean that sending an unsolicited fax containing no private content could be equated with "making known" material that violates one's privacy rights. *Id.* Furthermore, for the other listed advertising injury offenses, including slander, disparaging the work of others and using the slogan of another without authorization, the harm is caused by the content of the advertisement, not merely its receipt. *Id.* Therefore, understood in context, the policy was not intended to reach violations of the TCPA.

The Seventh Circuit, applying Illinois law, has also refused to construe the term "advertising injury offense" to include unsolicited faxes sent in violation of the TCPA. *Am. States Ins. Co. v. Capital Assocs. of Jackson County,* 392 F.3d 939 (7th Cir.2004). In *American States,* the court considered an insurance policy that defined "advertising injury" to include "oral or written publication of material that violates a person's right of privacy." *Id.* at 940. After noting that "privacy" refers to both secrecy and seclusion, the court concluded that the pertinent inquiry was not how Congress used the term "privacy" in the debates surrounding the TCPA, but how the policy used the term. *Id.* at 942. The structure of the policy implied that coverage was limited to interests in secrecy. *Id.* Because the policy required a "publication" in violation of a right of privacy, the policy could not be protecting seclusion interests; publication is irrelevant to protecting interests in seclusion but is vital if one is concerned with protecting secrecy. *Id.* at 942–43 ("To put this differently, § 227(b)(1)(C) condemns a particular means of communicating an advertisement, rather than the contents of that advertisement—while an advertising-injury coverage deals with informational content.").

Shortly after the Seventh Circuit's ruling in *American States,* the Second District Appellate Court of Illinois issued a decision critical of the Seventh Circuit's analysis. *See Valley Forge Ins. Co. v. Swiderski,* 359 Ill.App.3d 872, 296 Ill.Dec. 5, 834 N.E.2d 562 (2005). *Swiderski* considered language virtually identical to the policy language at issue in *American States. Id.* at 566. Applying Illinois' "broad duty to defend" and the well-established rule that undefined terms are to be given their plain, ordinary and popular meaning, the court rejected the reasoning in *American States. Id.* at 572–73. The court concluded that the word "publication" was ambiguous and would be construed against the insurer to include material covered under the policy even if not sent to a third party. *Id.* at 573–74. The court also rejected the Seventh Circuit's analysis of the right to privacy issue as improper contract construction under Illinois law. *Id.* at 574. The court noted that the insurer could have limited the definition of privacy, but having failed to do so, the court agreed with case law asserting that "privacy is privacy." *Id.* Because a reasonable person's definition would include the right to be free from intrusion, sending unsolicited faxes potentially fell within of the scope of the insurance policy. *Id.* at 575.

Subsequent to the decision in *Swiderski,* the Northern District of Illinois considered the issue of insurance coverage for sending unsolicited faxes. *St. Paul Fire & Marine Ins. Co. v. Brunswick Corp.,* 405 F.Supp.2d 890 (N.D.Ill.2005). The *Brunswick* court disagreed with the holding in *Swiderski,* stating that the *Swiderski*

court "appears to have disregarded the well settled rules of contract construction to which it referred." *Id.* at 894. The court determined that the policy covered the content of the material published, not the publishing itself. *Id.* at 895. Examining the provision in context also highlighted that the insurance contract defined the relevant terms by concentrating on the content of the material that invaded the privacy rights. *Id.*

Yet not all federal courts have concluded that violations of the TCPA are outside the scope of insurance coverage for advertising injury offenses. In *Western Rim Investment Advisors, Inc. v. Gulf Insurance Co.,* the court was faced with a policy that defined "advertising injury" to include, in part, "oral or written publication of material that violates a person's right of privacy." 269 F.Supp.2d 836, 840 (N.D.Tex.2003). The court's decision relied on the purposes behind the TCPA, which, the court held included protecting the privacy of individuals by penalizing those who sent unsolicited faxes. *Id.* at 847. The court did not read the policy language as requiring the "publication" of the offending material be to a third party. *Id.* The court also rejected the insurance company's claim that the policy was inapplicable because the underlying complaint did not allege that the content of the faxes was invasive. *Id.* The underlying complaint alleged that the unsolicited faxes, regardless of their content, violated recipients' rights to privacy. *Id.*

The Eleventh Circuit, applying Georgia law and interpreting language identical to the *Western Rim* policy, also held that the insurance company owed a duty to defend under an advertising injury clause. *Hooters of Augusta, Inc. v. Am. Global Ins. Co.,* 157 Fed.Appx. 201 (11th Cir.2005).

The policy failed to define the term "privacy," and Georgia law recognizes that the right to privacy includes the right to be left alone. *Id.* at 206. Accordingly, the court concluded that the term "privacy" was ambiguous, would be given its ordinary meaning, and would be read in favor of the insured. *Id.* The court also refused to read the term "publication" in a narrow legal sense, instead holding that sending unsolicited faxes "amounted to an act of 'publication' in the ordinary sense of the word." *Id.* at 208. The court distinguished both *American States* and *Resource Bankshares,* noting that in *Resource Bankshares* the Fourth Circuit considered a "more tightly worded advertising-injury provision" which suggested a focus on secrecy. *Id.*

Recently, the Tenth Circuit upheld a ruling from the District of Kansas, on a motion for judgment on the pleadings, that a duty to defend existed for TCPA violations under an insurance policy that defined "advertising injury" to include "oral or written publication of material that violates a person's right of privacy." *Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, PA.,* 442 F.3d 1239 (10th Cir. 2006). The court, while conceding a circuit split on the issue, held that the TCPA protects privacy interests in seclusion.[7] *Id.* at 1249. Turning its attention to the meaning of invasion of privacy, the court agreed with the district court that the TCPA was enacted to protect privacy rights, namely the right to be left alone. *Id.* The insurer failed to limit the scope of the term "privacy" and the insured's reading of the provision was reasonable. *Id.* at 1250. The court also agreed with the district court's interpretation of the term "publication." *Id.* at 1250 ("By faxing ad-

---

**7.** The court explicitly distinguished *Resource Bankshares* because the policies differed in their respective language. *Id.* at 1249 n. 5.

vertisements to the class of plaintiffs as alleged in the underlying state court complaint, Park University effectively published material in this broader sense, *i.e.*, communicated information generally, which undermined the recipients' right to be left alone."). As the policy was to be strictly construed against the insurer, the court refused to narrow the definition of "publication." *Id.* at 1250.

To summarize, courts have decided both in favor of and against coverage for unsolicited faxes sent in violation of the TCPA, although none have decided the issue under Pennsylvania law. Thus, while the Court does not begin from scratch, the case law is not a model of clarity.

### 4. Analysis under Pennsylvania law

The question before the Court is whether Melrose's alleged violations of the TCPA are covered under the "advertising injury" provisions of the Policy. As the Pennsylvania Supreme Court has not spoken on this issue and the parties have invoked the Court's diversity jurisdiction, this Court must predict how the Pennsylvania Supreme Court would resolve the issue. *See Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 378 (3d Cir.1990) ("In cases where the state's highest court has not considered the precise question to be answered, the federal court is called upon to predict how the state court would resolve the issue should it be called upon to do so."). The Court holds that the Pennsylvania Supreme Court would rule that Melrose's alleged violations of the TCPA are not covered under the Policy.

#### a. Congressional intent

At the outset, the Court notes that the Complaint fails to include a single reference to an invasion of privacy, instead relying on claims that the unsolicited faxes converted toner and paper and shifted Melrose's advertising costs to Class members. (Summ. J. J.A. Ex. 2 ¶¶ 10, 18, 21, 23, 25, 27, 29, 31.) Melrose argues that the Travel 100 Complaint alleges an invasion of privacy claim by virtue of the TCPA count. (Melrose's Mem. of Law in Supp. of Summ. J. Mot. at 17–18.)

It is clear that the TCPA aims in part to protect privacy.[8] Congress explicitly found that "[u]nrestricted telemarketing can be an intrusive invasion of privacy." (Melrose Mot. for Summ. J. Ex. H(1).) Furthermore, the case law consistently recognizes that the TCPA was enacted in part to address the privacy invasion created by sending an unsolicited fax. *See Hooters*, 157 Fed.Appx. at 206; *Resource Bankshares*, 407 F.3d at 639, 642; *Universal Underwriters Ins. Co. v. Lou Fusz Automotive Network*, 401 F.3d 876, 881–82 (8th Cir.2005); *Am. States*, 392 F.3d at 942; *Western Rim*, 269 F.Supp.2d at 847; *Prime TV, LLC v. Travelers Ins. Co.*, 223 F.Supp.2d 744, 752–53 (M.D.N.C.2002). There is no indication that Congress passed the TCPA to allay concerns regarding private material being communicated via fax. Instead, Congress took aim at the *intrusive* nature of unsolicited faxes.

---

**8.** It is equally clear that Pennsylvania law also protects privacy interests. *See* Pa Const. art. I, § 8. Pennsylvania recognizes the tort of invasion of privacy. *Marks v. Bell Tel. Co. of Pa.*, 460 Pa. 73, 331 A.2d 424, 430 (1975). In fact, invasion of privacy is actually comprised of four distinct torts, including intrusion upon seclusion. *(Id.)* Nonetheless, this Court must focus on the terms of the Policy, and those terms do not cover invasions of solitude. *See Duff Supply Co. v. Crum & Forster Ins. Co.*, Civ. A. No. 96–8481, 1997 WL 255483, at *9 (E.D.Pa. May 8, 1997) (holding that monitoring calls was not covered under personal injury provision that required a publication because monitoring calls, while an invasion of one's right to seclusion, did not involve publication).

Much the same way a telemarketing call invades one's right to be left alone, an unsolicited fax intrudes upon the right to be free from nuisance. But neither the telemarketer's call nor the unsolicited fax implicate the disclosure of personal information. Accordingly, the TCPA seeks to protect privacy interests in seclusion, not secrecy.

The Court need not wade too deeply into the murky waters of Congressional intent. After all, the Court must uncover the intentions of the parties as demonstrated by the insurance contract, and it is doubtful that Melrose or St. Paul considered Congressional intent when they entered into this contract. Thus, the Court rejects the reasoning of those courts which have found that TCPA violations are covered under "advertising injury" provisions because the TCPA protects some form of privacy interests. *See Western Rim,* 269 F.Supp.2d at 847; *Park Univ. Enters. v. Am. Cas. Co. of Reading, PA.,* 314 F.Supp.2d 1094, 1109 (D.Kan.2004), *aff'd,* 442 F.3d 1239 (10th Cir.2006); *Prime TV,* 223 F.Supp.2d at 752–53. Regardless of Congress' intentions with respect to the TCPA, the Court's duty is to ascertain the parties' intent. The question is whether, reading the Policy as a whole and giving full effect to those terms that are not ambiguous, the Court concludes the parties intended that Melrose's sending of unsolicited faxes would qualify as "making known to any person or organization covered material that violates a person's right to privacy."

*b. The meaning of "privacy"*

■ The Court concludes that this provision is clear and unambiguous and that Melrose's actions are not covered by the "advertising injury" provisions of the Policy. First, although the term privacy can imply multiple meanings, that fact alone cannot suffice to create ambiguity. *See*

*Resource Bankshares,* 407 F.3d at 640 ("But, contrary to [plaintiff's] contentions, this nominal overlap does not necessarily result in *ambiguity.* Every word in [the policy's advertising injury provision] contains different meanings, but all read clearly in context.") (emphasis in original); *see also J.C. Penney,* 393 F.3d at 363 ("That is, 'a court must refrain from torturing the language of a policy to create ambiguities where none exist.' ") *(quoting McMillan,* 922 F.2d at 1075). If multiple definitions alone created ambiguity, insurance policies would either lose all meaning or would devolve into epic tomes.

Second, although the term "privacy" is not defined in the Policy, the term as used in the Policy is clear and unambiguous. *Cf. Hooters,* 157 Fed.Appx. at 205–06 ("Notably, the insurance policy contains no language explicitly limiting the scope of the term 'privacy' or, for that matter, alerting non-expert policyholders that coverage depends on the source of law underlying the relevant privacy right."); *Swiderski,* 296 Ill.Dec. 5, 834 N.E.2d at 574; *Park Univ.,* 442 F.3d at 1249–50. The failure to define a term should not send the Court scurrying to a dictionary hunting for ambiguity. *See Simon Wrecking Co., Inc. v. AIU Ins. Co.,* 350 F.Supp.2d 624, 636 (E.D.Pa.2004) *(citing Borish v. Britamco Underwriters, Inc.,* 869 F.Supp. 316, 319 (E.D.Pa.1994)). Nor may the Court twist the Policy's language to create an ambiguity. *See LuckerMfg. v. HomeIns. Co.,* 23 F.3d 808, 814 (3d Cir.1994). In fact, whenever possible, the Court should read the Policy to avoid ambiguity. *See J.C. Penney,* 393 F.3d at 363. Applying multiple definitions to terms that are clear and unambiguous in context would subvert well-established principles of Pennsylvania contract interpretation. The Court finds that the Policy clearly confines the term "privacy" to interests in secrecy.

Third, read in context, the definition of privacy in the Policy is confined to matters of secrecy, not seclusion. Plaintiff encourages this Court to read particular words alone and to conclude that because those words may have multiple meanings, the provision itself is ambiguous. But a single word in an insurance policy should not be read in a vacuum; specific provisions in a policy gain meaning based on their context in the policy as a whole. *See 401 Fourth St.*, 879 A.2d at 172 (noting that courts must not analyze insurance contract terms in isolation, but rather must analyze entire contractual provision). As noted previously, the term "advertising injury offense" includes the following specific offenses:

- Libel or slander, in or with covered material.
- Making known to any person or organization covered material that disparages the business, premises, products, services, work, or completed work of others.
- Making known to any person or organization covered material that violates a person's right of privacy.
- Unauthorized use of any advertising material, or any slogan or title, of others in your advertising.

(Summ. J. J.A. Ex. 1.) The offenses enumerated in this provision clearly relate to the content of the covered material. *See USX Corp. v. Adriatic Ins. Co.*, 99 F.Supp.2d 593, 619–20 (limiting definition of "unfair competition" based on context in which term used). Defamation, disparagement and misappropriation all focus on the message contained in the covered material. All of these offenses address the message conveyed rather than the method of conveyance.

The Travel 100 Complaint does not raise any issues regarding the content of the faxes sent, instead focusing on the depleted resources that resulted from the unauthorized faxes. Although the Travel 100 Complaint contains a claim under the TCPA, that statute addresses the privacy interest in being left alone, which is not the privacy interest addressed in the Policy. Accordingly, the "advertising injury" provision does not cover the sending of unsolicited faxes because Melrose's alleged actions do not fall within the scope of the Policy's coverage for invasions of privacy.

The Court is not persuaded by Melrose's argument that "in the context of the privacy right of seclusion protected by the TCPA, it is the content of the faxed material that gives rise to the violation." (Melrose's Resp. in Opp'n to St. Paul's Mot. for Summ. J. at 19–20.) Again, Congress was concerned with the intrusive nature of unsolicited faxes and the inappropriate shifting of advertising costs onto businesses whose fax machines were jammed with junk faxes. Thus, Congress took aim at unsolicited advertisements, not the content of those advertisements. The Court therefore disagrees with Melrose's assertion that because the TCPA applies to advertisements it is a content-based statute. In fact, if such were the case, the constitutionality of the statute would be questionable. *See United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 817, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) ("When the Government seeks to restrict speech based on its content, the usual presumption of constitutionality afforded congressional enactments is reversed. 'Content-based regulations are presumptively invalid.' ") (*quoting R.A. V. v. St. Paul*, 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992)).

### c. The meaning of "making known to"

The parties also contest whether the terms of the Policy require that the covered material "be made known" to a third party. Melrose would read the phrase to

encompass a scenario whereby the party whose privacy rights were invaded was the same party to whom the covered material was made known. (Melrose's Mem. of Law in Supp. of Mot. for Summ. J. at 22–23.) However, the Court agrees with the Eleventh Circuit's analysis in *Hooters;* the phrase "making known" suggests a focus on secrecy not present in those policies which define advertising injury offense to include "oral or written publication of material that violates a person's right of privacy." *Hooters,* 157 Fed.Appx. at 208. "Making known to any person or organization" implies a disclosure to a third party or divulging of a secret. This stands in contrast with the term "publication," which can include the simple act of issuing or proclaiming. "Making known to" denotes that Melrose is only covered if the relevant material reveals an item of information that violates a third party's right to privacy. If a Melrose employee phoned a residence and stated that the hotel had rooms available for $100 a night, Melrose has not made known to that person information that violates another person's right to privacy. Melrose has arguably breached the right to be left alone of the person who they phoned. If, however, the Melrose employee called that same residence and revealed personal information about a Melrose customer, Melrose has "made known" or disclosed information that violates the customer's right to privacy.

Furthermore, by requiring that the covered material be made known to any *per-son or organization* but insisting that the covered material violate a *person's* right of privacy, the Policy makes clear that the "making known" can be to a person or a company, but the covered material made known must be violative of an individual's privacy rights. This further highlights that the Policy covers Melrose for the content of its ads and requires the privacy-invading information be made known to a third party.[9] It is the person whose secret is revealed by the content of the ad, not the person or organization to whom the secret is revealed, that suffers the injury. The phrase "making known to" requires that at least three parties be involved—Melrose, who must be the one disclosing; the recipient of the disclosure; and the person whose private material has been disclosed.

The Court finds persuasive the reasoning in *Resource Bankshares,* which examined language virtually identical to the Policy language. The Court further finds that those cases that have found a duty to defend for TCPA violations under an "advertising injury" provision are distinguishable from the case at bar. Those courts considered broader language, which could arguably be read to include violations of the right to be left alone, the privacy right protected by the TCPA. *See, e.g., Western Rim,* 269 F.Supp.2d at 840 ("oral or written publication of material that violates a person's right of privacy"); *Hooters,* 157

---

9. The Court agrees with Melrose that the Travel 100 Complaint, brought on behalf of "all persons who were sent facsimiles ..." asserts that Melrose potentially faxed its ads to both companies and individuals. (Melrose's Resp. in Opp'n to Def.'s Mot. for Summ. J. at 19 n. 9.) Therefore, although an *individual's* right to privacy must be violated, the Travel 100 Complaint leaves open the possibility that individual Class members might have received unsolicited faxes. The Court however, points out the use of the term "person's right of privacy" to highlight that the *content* of the ad must violate an individual's privacy rights, although coverage is available should the covered material be made known to an individual or an organization. *See Am. States,* 392 F.3d at 942 ("[B]usinesses lack interests in seclusion ... Where does a corporation go when it just wants to be left alone?").

Fed.Appx. at 205 (same); *Park Univ.*, 314 F.Supp.2d at 1106 (same).

The Court finds that the clear and unambiguous provision "making known to any person or organization covered material that violates a person's right of privacy" requires that the content contained in the covered material must violate a person's right of privacy and must be made known to a third party. Because the Travel 100 Group Complaint contains no such allegations, the "advertising injury liability" portion of the Policy does not cover Melrose's alleged actions, and St. Paul owes Melrose no duty to defend Melrose under that provision.

### D. The Policy's Property Damage Provisions

#### 1. *Melrose's contentions*

Determining that no duty to defend exists under the advertising injury provision of the Policy does not end the Court's inquiry. Melrose also asserts that St. Paul's duty to defend is triggered under the Policy's "property damage" provisions, which cover the "loss of use of tangible property of others that isn't physically damaged." (Melrose's Mem. of Law in Supp. of Mot. for Summ. J. at 25–32.) Melrose supports its position with the allegations of the Travel 100 Complaint that Melrose appropriated to its own use the fax paper and toner and used these items in such a manner as to make them unusable by their owners. (Summ. J. J.A. Ex. 2 ¶¶ 10, 18, 21, 23, 25, 29, 31.) Furthermore, Melrose claims the TCPA is "inherently a claim for property damage" because it seeks to prevent the appropriation of expensive paper and costs related to operating a fax machine. (Melrose's Mem. of Law in Supp. of Mot. for Summ. J. at 26.)

The key issue related to the property damage provision of the Policy relates to the accidental or intentional nature of Melrose's conduct. The Policy only covers property damage that is "caused by an event," defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Summ. J. J.A. Ex. 1.) Melrose claims that the sending of unsolicited faxes is covered by the Policy because the Travel 100 Complaint includes allegations that Melrose "should have known" that the sent faxes were unauthorized. (Melrose's Mem. of Law in Supp. of Mot. for Summ. J. at 27.) Melrose suggests that such language equates with unintentional conduct and therefore falls under the Policy. (*Id.* at 27–28.) Furthermore, the TCPA is a strict liability statute that permits recovery for unintentional conduct. (*Id.* at 28.)

According to Melrose, St. Paul has a duty to defend because under the Policy an "event" includes the transmission of faxes to unauthorized recipients. (*Id.* at 27–28.) This remains true even if the faxes were sent intentionally, provided Melrose was negligent in its belief that the faxes were sent with the permission of the recipient. (*Id.* at 29, 31.) Melrose reasonably believed that its third party vendor obtained the necessary consent to send the faxes. (*Id.* at 29.) Sending a fax does not equate with intending to cause damage; therefore, "[b]ecause Melrose did not intend to send the faxes in violation of the TCPA, the resulting property damage was accidental and was, therefore, caused by an 'event' under the terms of the policy." (*Id.*)

For many of these same reasons Melrose claims that sending an unauthorized fax does not fall within the Policy's exclusion for "property damage that's expected or intended by the protected person." (*Id.* at 29–32.) Melrose argues that it did not expect or intend to cause property damage because it believed that the recipients au-

thorized the fax transmissions, and therefore, it is entitled to a defense under the Policy. *(Id.)*

### 2. St. Paul's contentions

St. Paul counters that Melrose is not entitled to coverage because its actions were not the result of an "event" as defined by the Policy. (St. Paul's Mem. of Law in Supp. of Mot. for Summ. J. at 17–24.) St. Paul relies on the Travel 100 Group's allegations that Melrose intentionally used the recipients' toner and paper. According to St. Paul, Melrose was undoubtedly aware that sending a fax uses the machine, paper and toner of the recipient. *(Id.* at 18–19, 24.) Such unauthorized usage is exactly the type of property damage that the TCPA seeks to prevent. *(Id.* at 19.) Melrose knew precisely where its faxes would go; in fact, Melrose paid only for those faxes that reached their intended destination. *(Id.)* Therefore, any "property damage" the recipients suffered was not the result of an "event" but rather was "expected or intended by the protected person." *(Id.)* It is irrelevant whether Melrose intended to violate the TCPA; the relevant inquiry is whether Melrose knew that sending the faxes would deplete the resources of the recipient. *(Id.* at 23–24.)

### 3. The property damage legal landscape

To date no court has applied Pennsylvania law to decide whether TCPA violations are covered under a property damage provision of an insurance policy. However, numerous courts across the country have considered the issue.

The Seventh Circuit, in *American States*, held that a policy's intentional-tort exception foreclosed coverage. The court noted that "[s]enders may be uncertain whether particular faxes violate [the TCPA] but all senders know exactly how

faxes deplete recipients' consumables." *Am. States*, 392 F.3d at 943. Using the recipients' resources is a normal and expected outcome of sending faxes and therefore excluded as "expected or intended from the standpoint of the insured." *Id.*

In *Resource Bankshares*, the Fourth Circuit also refused to find a duty to defend under a property damage clause that defined "event" in terms identical to those now before the Court. The court noted that under Virginia law whether an event qualifies as an "accident" depends on "whether the incident or injury was a reasonably foreseeable result of the insured's actions." *Resource Bankshares*, 407 F.3d at 637 (citations omitted). The sender argued its actions were accidental because it intended only to fax ads to those recipients who consented to receiving them. The court rejected this "accidental fax" argument. *Id.* at 638. The TCPA forbids all unsolicited fax advertisements and defines unsolicited faxes as those transmitted "without prior express invitation or permission." *Id. (quoting* 47 U.S.C. § 227(a)(4)). But the record contained no evidence that would cause a reasonable person to mistakenly believe that the sender had received prior express permission to send their fax ads. *Id.* "Because Resource plainly (1) intended to transmit the faxes to *someone,* and (2) fails to present evidence that could reasonably be mistaken as express permission to send these faxes, we can only conclude that the sending was not accidental." *Id.* at 639 (emphasis in original). Finally, the court agreed with the reasoning of *American States* that a natural outcome of sending a fax "occasions the very property damages the TCPA was written to address." *Id.*

The court in *Western Rim*, which found a duty to defend under an advertising injury provision, concluded that no such

duty to defend arose from a property damage clause because the underlying complaint failed to allege an "occurrence" under Texas law. 269 F.Supp.2d at 843–45. The court held that "[a]lthough the faxing of the unsolicited advertisements is alleged to have been performed negligently, the damages that the [Class members] alleged they incurred are the intended and expected effects even if the [parties sending the faxes] had obtain[ed][ ] permission ... before they faxed the advertisements." *Id.* at 845. Accordingly, the court found that there was no accident and no duty to defend.

The *Brunswick* court also rejected a duty to defend under a property damage clause and policy exclusion, holding that the property damage alleged in the underlying complaint, the lost ink and paper, was a normal and expected outcome and, accordingly, was not covered. 405 F.Supp.2d at 895–96.

Not all courts examining the issue have concluded that TCPA violations cannot qualify as accidents. The court in *Prime TV* concluded that the alleged property damage was the result of an "accident" as defined by the policy, and therefore the insurer had a duty to defend. 223 F.Supp.2d at 750–51. The court held that although the faxes were sent intentionally, because the sender believed that the recipients requested the faxes, the "property damage" was the result of an "occurrence" and a duty to defend existed under the policy. *Id.* at 752. In essence, the court adopted the "accidental fax" argument rejected in *Resource Bankshares*.

Similarly, the Tenth Circuit concluded in *Park University* that sending faxes constituted an accident because the underlying complaint contained a claim that the parties sending the faxes "should have known" that the ads were unsolicited. 442 F.3d at 1244–47. Applying the "natural and probable consequences test" under Kansas law, the court held that "when Park University sent the fax to JC Hauling, it thought it had permission to do so. Hence, from its standpoint, any resulting use of JC Hauling's fax machine, paper, and toner could not have resulted in injury because Park University thought it was welcome." *Id.* at 1246. The court took pains to note, however, that the procedural posture of the case before it—review of a motion for judgment on the pleadings—rendered *Resource Bankshares* inapposite. *Id.* at 1246–47. Unlike the Fourth Circuit in *Resource Bankshares,* the Tenth Circuit considered Park University's assertions that its actions were solicited. *Id.* at 1247.

### 4. The definition of accident under Pennsylvania Law

What is an accident?
Everyone knows what an accident is until the word comes up in court. Then it becomes a mysterious phenomenon, and, in order to resolve the enigma, witnesses are summoned, experts testify, lawyers argue, treatises are consulted and even when a conclave of twelve world-knowledgeable individuals agree as to whether a certain set of facts made out an accident, the question may not yet be settled, and it must be reheard in an appellate court.

*Resource Bankshares,* 407 F.3d at 637 n. 5 *(quoting Brenneman v. St. Paul Fire & Marine Ins. Co.,* 411 Pa. 409, 192 A.2d 745, 747 (1963)).

In Pennsylvania, the fact that an event causing an injury is attributable to the intentional acts of a third party does not preclude the event from qualifying as an "accident." *See Nationwide Mut. Fire Ins. Co. of Columbus, Ohio v. Pipher,* 140 F.3d 222, 225–26 (3d Cir.1998) *(relying, in part, on Mohn v. Am. Cas. Co. of Reading,* 458 Pa. 576, 326 A.2d 346, 348 (1974)).

However, when the conduct of the insured is alleged to be intentional, there is no accident. *See Kirkpatrick v. AIU Ins. Co.,* 204 F.Supp.2d 850, 854 (E.D.Pa.2002). This rule comports with the basic premise of insurance: "to cover only fortuitous losses." *Elitzky,* 517 A.2d at 986. Indeed, it contravenes the public policy of Pennsylvania to provide insurance for intentional acts. *See id. (citing Nationwide Mut. Ins. Co. v. Hassinger,* 325 Pa.Super. 484, 473 A.2d 171, 173 (1984)). The vantage point of the insured, not that of the person who committed the injurious act, determines whether an injury is caused by an accident. *See Pipher,* 140 F.3d at 226. Pennsylvania courts use a subjective standard to determine whether an insured intended an injury and must decide whether the insured "desired to cause the consequences of his act or if he acted knowing that such consequences were substantially certain to result." *Elitzky,* 517 A.2d at 989; *see also Wiley v. State Farm Fire & Cas. Co.,* 995 F.2d 457, 460 (3d Cir.1993). Thus, "it is not sufficient that the insured intends his actions; rather, for the resulting injury to be excluded from coverage, the insured must have specifically intended to cause harm." *Wiley,* 995 F.2d at 460; *see also Elitzky,* 517 A.2d at 987. Accordingly, foreseeability is irrelevant. *Kirkpatrick,* 204 F.Supp.2d at 854 (citations omitted).

Numerous Pennsylvania cases have considered the meaning of the term "accident" based upon contractual language similar to that in the Policy. In *Gene's Restaurant, Inc. v. Nationwide Insurance Co.,* a restaurant patron alleged that an employee of the restaurant "willfully and maliciously assaulted and beat" her. 519 Pa. 306, 548 A.2d 246, 247 (1988). The restaurant's insurance policy contained language similar to that found in the Policy. The court held that the "willful and malicious assault alleged in the complaint is not an accident but rather is an intentional tort. As such,

it is not covered by the policy, and therefore, the insurer owed no duty to defend." *Id.*

The Pennsylvania Superior Court distinguished *Gene's Restaurant* in the case of *Britamco Underwriters, Inc. v. Weiner.* In *Weiner,* a bar patron sued the owners of the bar, alleging that a co-owner and an employee struck him. 431 Pa.Super. 276, 636 A.2d 649, 650 (1994). The complaint included allegations of intentional, reckless and negligent conduct. *Id.* The court held that the complaint alleged an "occurrence," defined as an "accident" by the insurance policy, and therefore the insurer had a duty to defend. The court's decision was based on its reading of the complaint, which at one point referred to the incident in question as an "accident" and asserted alternative theories of recovery sounding in negligence. *Id.* at 652. The court distinguished *Gene's Restaurant* by noting that the complaint in that case alleged solely intentional conduct. *Id.*

Shortly after the ruling in *Weiner,* the Pennsylvania Superior Court extended the holding of *Gene's Restaurant. See Britamco Underwriters, Inc. v. Grzeskiewicz,* 433 Pa.Super. 55, 639 A.2d 1208 (1994). *Grzeskiewicz* also arose from a barroom brouhaha, with the underlying complaint claiming that a patron of the pub attacked the plaintiff with a broken beer bottle. *Id.* at 1209. The complaint also alleged that plaintiff's injuries were attributable to the reckless and negligent actions of the pub. *Id.* The court held that no duty to defend existed under an insurance policy requiring that any injuries or property damages result from an "occurrence," meaning an "accident." According to the court, the complaint did not allege that the incident in question was an "accident" or that any injuries resulted from the attacker's negligence. *Id.* at 1210–11. The case was distinguishable from *Weiner* because the

plaintiff in *Weiner* did not allege that his injuries were solely the result of defendants' intentional acts. *Id.* at 1211. Because the relevant actor in *Grzeskiewicz* was not alleged to have acted negligently, the incident could not be termed an accident under the policy. *See Donegal Mut. Ins. Co. v. Baumhammers,* 893 A.2d 797, 807–08 (2006).

Recently, however, the Pennsylvania Superior Court disapproved of the *Grzeskiewicz* holding because it read *Gene's Restaurant* too broadly and *Weiner* too narrowly. *Baumhammers,* 893 A.2d at 808. *Baumhammers* involved a killing spree perpetrated by the son of the insured. *Id.* at 802–03. The estates of several of Baumhammers' victims sued Baumhammers and his parents alleging, among other claims, negligence on the part of his parents. *Id.* at 803–04. The parents sought coverage under their homeowner's insurance policy, which provided defense coverage for a claim brought for bodily injury caused by an "occurrence," defined as an "accident." *Id.* at 804. The policy also contained an exclusion "for bodily injury that is expected or intended by the 'insured.' " *Id.* The *Baumhammers* court concluded that "where, as here, the alleged negligence of an insured leads to an intentional act, such an act does not preclude a determination that the preceding negligence was an accident warranting coverage." *Id.* at 810. Thus, "negligence leading to intentional acts may nevertheless be considered an 'accident,' and thus an 'occurrence' where so defined." *Id.* Examining the facts of the complaint, the court determined that the alleged acts of negligence of the parents, supported by "numerous, specific, factual allegations," could be considered an "accident" under the policy, and therefore the insurer owed the insured a defense. *Id.* at 811.

The *Baumhammers* decision cited favorably to the Third Circuit's decision in *Pipher,* 140 F.3d 222. In *Pipher,* the insured owned a multi-unit dwelling in Philadelphia, previously owned by her parents. *Id.* at 223. Either the insured or her parents removed the doors to the second floor apartment to install new carpeting. *Id.* The doors were never reinstalled. *Id.* The insured later hired a painter to paint the second floor apartment. *Id.* at 224. The painter killed the occupant of the apartment and the occupant's husband sued the insured and her parents. *Id.* The court, predicting how the Pennsylvania Supreme Court would rule if faced with the question, held that "an occurrence, as used in a liability insurance policy, includes a plaintiff's bodily injury or death that is the direct result of the intentional act of a third party when the injury or death is also attributable to the negligence of the insured." *Id.* at 228. The court did not believe that *Gene's Restaurant* controlled the outcome of *Pipher* because the complaint in *Pipher* contained distinct allegations of negligence that the third party's crimes were made possible by the negligent conduct of the insured. *Id.* at 225. According to the court, under Pennsylvania case law, the question of whether an injury resulted from an accident must be viewed from the insured's viewpoint, not that of the person committing the injurious act. *Id.* at 226. Therefore, the fact that an intentional act of a third party caused an injury does not foreclose the injury from being deemed an "accident" for purposes of insurance coverage. *Id.* ("[I]t is the intentional conduct of the insured which precludes coverage, not the acts of third parties.").

### 5. Analysis

#### a. The Complaint alleges "property damage"

As a threshold matter, the Court concludes that using one's fax machine,

paper, and toner without permission qualifies as property damage under the Policy. St. Paul, while appearing to concede that the Travel 100 Complaint seeks to recover damages for "property damage" as defined in the Policy, puts forth a weak argument that because the Class members sought a statutory penalty under the TCPA, the Class does not seek to recover for "property damage." (St. Paul's Mem. of Law in Supp. of Mot. for Summ. J. at 17, 17 n. 7.)

The Court rejects this argument.[10] The Travel 100 Complaint states on numerous occasions that Melrose's actions deprived Class members of toner and paper, rendering them unusable. In addition, the unauthorized faxes temporarily "fax-jacked" the owner's machine, leaving the owner unable to use the machine as desired. The Policy ensures coverage for "amounts any protected person is legally required to pay as damages for covered ... property damage" and defines "property damage" to include both "physical damage to tangible property of others, including all resulting loss of use of that property" and "loss of use of tangible property of others that isn't physically damaged." (Summ. J. J.A. Ex. 1.) The Travel 100 Complaint alleges that Class members lost the use of tangible property and that the TCPA exists in part to provide a remedy for persons whose fax machines are taken over by blast faxers. Certainly, sending a fax uses toner, paper and the fax machine, regardless of whether such usage constitutes physical damage. The purpose of statutory damages under the TCPA is to compensate those whose

toner, paper, and fax machines are used without their consent. The Policy says nothing about covering only those damages that represent actual harm, as opposed to statutory damages, and makes no reference to covering only those damages that reach a specified threshold. The TCPA provides for statutory damages because it is unlikely that private parties would sue to enforce the law if the only damages recoverable were the costs of the toner and paper, which are relatively inexpensive items. Accordingly, the Court finds that property damage is at issue in the Travel 100 Group litigation.

*b. The "property damage" did not result from an "event"*

Guided by the case law on insurance coverage for violations of the TCPA as well as Pennsylvania case law on what constitutes an "accident," the Court predicts that the Pennsylvania Supreme Court would not term the allegations in the Travel 100 Complaint an "accident" and would therefore reject a duty to defend in this case under the Policy's "property damage" provisions.

A close reading of Travel 100's Complaint reveals that Class members are seeking damages solely for intentional conduct. The Court is not persuaded to the contrary simply because the Travel 100 Complaint uses the phrase "should have known." *See Dalrymple,* 153 F.Supp.2d at 628 (noting that factual allegations in complaint trigger duty to defend, not simply using term "negligence"); *see also Haver,* 725 A.2d at 745 ("However, the particular

---

**10.** The Court also rejects St. Paul's argument that the TCPA is a penal statute. Most courts that have considered the issue have held that the TCPA is not a penal statute. *See, e.g., Hooters of Augusta, Inc. v. Am. Global Ins. Co.,* 272 F.Supp.2d 1365, 1376 (S.D.Ga.2003), *aff'd,* 157 Fed.Appx. 201 (11th Cir.2005); *Nutmeg Ins. Co. v. Employers Ins. Co. of Wau-* sau, Civ. A. No. 04–1762B, 2006 WL 453235, at *7 (N.D.Tex. Feb.24, 2006) ("The TCPA is not a penal statute.") *(citing Western Rim,* 269 F.Supp.2d at 849); *but see U.S. Fax Law Ctr., Inc. v. iHire, Inc.,* 362 F.Supp.2d 1248, 1253 (D.Colo.2005) ("I conclude that the TCPA is penal in nature.").

cause of action that a complainant pleads is not determinative of whether coverage has been triggered. Instead it is necessary to look at the factual allegations contained in the complaint."). The Travel 100 Complaint does not assert that Melrose accidentally sent faxes to those who did not consent to receiving such faxes. Moreover, the Travel 100 Complaint does not contain any specific factual allegations that it was Melrose's negligence which made possible the intentional acts that harmed the Class members. The Travel 100 Complaint makes it clear that Melrose, through its third party vendor, intentionally sent faxes to Class members who had not given prior express consent to receive those faxes.

Melrose clearly intended to fax its advertisements to Class members. It paid the third party vendor only for those faxes that reached their intended destination. By virtue of its lawsuit under the TCPA, the Travel 100 Group asserts that Melrose's faxes were unsolicited. But the Travel 100 Complaint fails to allege that the unsolicited nature of the faxes was the result of an accident on the part of Melrose. At most, the Travel 100 Complaint leaves open the possibility that Melrose did not know that it was in breach of the TCPA, but such lack of knowledge is a far cry from allegations that Melrose's negligence was at least partially responsible for the TCPA violations alleged in the Travel 100 Complaint. Because of the absence of: (1) any distinct allegations that Melrose acted negligently; (2) any evidence that the faxes were accidentally sent to those who did not wish to receive them; or (3) any evidence that Melrose believed that the faxes would go only to those who had authorized their receipt, the Court concludes that sending the faxes cannot be deemed an "event" under the Policy.

Preventing the unauthorized use of fax machines, toner and paper was a central goal behind the passage of the TCPA. Congress clearly sought to forbid the shifting of advertising costs and wasting of resources that accompanies the sending of unsolicited advertisements. (Melrose Summ. J. Ex. H(3) [Congressional findings that junk faxes shift advertising costs and render recipient's fax machine unavailable for use while processing and printing junk fax] ); *see also Resource Bankshares*, 407 F.3d at 639 ("[R]eceipt alone occasions the very property damage the TCPA was written to address: depletion of the recipient's time, toner, and paper, and occupation of the fax machine and phone line"). Common sense dictates that a fax will deplete the recipient's toner, paper and ability to use its machine. *See Am. States*, 392 F.3d at 943 ("Senders may be uncertain whether particular faxes violate [the TCPA] but all senders know exactly how faxes deplete recipients' consumables."). Indeed, these ills represent precisely what Melrose knew would happen upon faxing its advertisements to businesses. (Summ. J. J.A. Ex. 17 [Cappellet Dep.] at 73–74.)

Melrose's argument is not actually that its negligent conduct led to an intentional act that violated the TCPA, but rather that it was ignorant that its own intentional acts violated the TCPA. Ignorance is not synonymous with negligence, and neither the Travel 100 Complaint nor the record before this Court contain support for a claim of negligence on the part of Melrose. Furthermore, Melrose's knowledge about the TCPA and its lack of intent to violate the TCPA are irrelevant to whether it intended to cause the harm that befell Class members. *See USX Corp.*, 99 F.Supp.2d at 631. Here, Melrose knew that its actions would cause the very harm that the TCPA aims to prevent. Accordingly, no duty to defend arises under the Policy's property damage provisions.

#### c. The "accidental fax" argument

Like the court in *Resource Bankshares*, this Court is not persuaded by Melrose's accidental fax argument because no evidence in the record supports it.[11] *See Resource Bankshares*, 407 F.3d at 638–39. The deposition testimony cited by Melrose to support its position does not reach as far as Melrose suggests. It was Melrose that selected the particular regions where the third party vendor would send Melrose's advertisements. (Summ. J. J.A. Ex. 16 at 67.) Melrose undertook no investigation to determine whether the recipients of its advertisements authorized their receipt, nor did Melrose take any steps to ensure that it fulfilled its contractual obligation to comply with laws relating to the sending of unsolicited faxes. *(Id.* at 99, 101–02.) The record does not support a finding that Melrose believed it received prior express permission to send faxes to parties. Instead, the record shows that Melrose ceded to its third party vendor Melrose's obligation to send faxes only to those entities that granted Melrose permission to do so. Such conduct belies willful blindness, not negligence. Furthermore, under its contract with third party vendor Captaris, Melrose warranted that it would comply with all laws and regulations relating to sending unsolicited communications. (Summ. J. J.A. Ex. 4.)

Melrose cannot hide behind Captaris' purported inaction when the record shows that Melrose failed to ensure that it had permission to send the faxes. As in *Resource Bankshares*, the record contains no evidence that would support a finding that Melrose reasonably believed it had express prior permission to fax its advertisements to Class members. Melrose cannot justify its intentional conduct after the fact by asserting that it might have been negligent. Both the Travel 100 Complaint and the record refute such a justification.

#### d. The Policy's exclusion for intended or expected property damage

 The Court will briefly address the Policy's exclusion for property damage "that's expected or intended by the protected person." (Summ. J. J.A. Ex. 1.) Because a claim that an exclusion forecloses coverage is an affirmative defense, the insurer bears the burden of proving that the exclusion applies. *See Koppers*, 98 F.3d at 1446. In Pennsylvania, exclusionary clauses are considered ambiguous as a matter of law and must be construed against the insurer. *Elitzky*, 517 A.2d at 987. Therefore, in Pennsylvania "the exclusionary clause applies only when the insured intended to cause a harm. Insurance coverage is not excluded because the insured's actions are intentional unless he also intended the resultant damage." *Id. (citing Mohn*, 458 Pa. 576, 326 A.2d 346). An insured intended to cause harm if it "desired to cause the consequences of his act or if [it] acted knowing that such consequences were substantially certain to result." *Elitzky*, 517 A.2d at 989. Courts employ a subjective standard with regard to the insured's intent. *See Wiley*, 995 F.2d at 460.

Under this definition, Melrose clearly intended to use the resources of its fax

---

**11.** It is a well-established rule that an insurer's duty to defend depends solely on the allegations contained in the plaintiff's complaint. *Pipher*, 140 F.3d at 225 (citations omitted); *see also I.C.D. Indus. v. Fed. Ins. Co.*, 879 F.Supp. 480, 488 (E.D.Pa.1995) ("[Pennsylvania courts] continue[ ] unabatedly to apply the rule that it is the allegations within the four corners of the complaint that govern."). Accordingly, the Court's determination that the Travel 100 Complaint alleges only intentional conduct ends the legal inquiry. The Court's further analysis is intended only to demonstrate that Melrose's arguments regarding its intentions in sending the faxes are not supported by the record.

recipients.[12] The Court does not interpret Pennsylvania law to require that the insured must intend to violate the law before coverage is foreclosed under an exclusionary clause. Rather, coverage here is foreclosed because Melrose intended the very harm that the TCPA is designed to prevent. *See Elitzky*, 517 A.2d at 988 ("Courts must construe ambiguous clauses in favor of the insured but at the same time insurance companies should not be forced to insure against harm deliberately brought about by the insured."). Accordingly, the Policy exclusion for "expected or intended" property damage also forecloses coverage in this case.

## IV. CONCLUSION

For the above stated reasons, the Court holds that Melrose's actions do not qualify as an "advertising injury offense" or as "property damage" resulting from an "event." Accordingly, St. Paul does not have a duty to defend under the Policy. The Court therefore grants St. Paul's motion for summary judgment and denies Melrose's motion for summary judgment. An appropriate Order follows.

### ORDER

**AND NOW**, this 19th day of April, 2006, upon consideration of the parties' cross-motions for summary judgment, all responses thereto, all replies thereon, and for the foregoing reasons, it is hereby **ORDERED** that:

1. St. Paul's Motion to File a Reply Brief (Document No. 53) is **GRANTED.**

2. St. Paul's Motion to Compel Production of Documents Generated in the Defense of the Underlying Action (Document No. 33) is **DENIED as moot.**

3. Melrose's Motion for Partial Summary Judgment on Count I (Document No. 38) is **DENIED.**

4. St. Paul's Motion for Summary Judgment (Document No. 40) is **GRANTED.**

5. Plaintiff's Complaint is **DISMISSED with prejudice** in its entirety.[1]

6. The Clerk of Court is directed to close this case.

12. An "expected injury" occurs when the insured "acted even though he was substantially certain that an injury generally similar to the harm which occurred would result." *Elitzky*, 517 A.2d at 991. Because the *Elitzky* court held that "intentional or expected are synonymous for purposes of insurance exclusionary clauses," the analysis is unchanged regardless of whether the harm Melrose caused is considered intended or expected. *See id.*

1. Melrose's Complaint contains a breach of contract claim. During a telephone conference with this Court, Melrose conceded that should the Court find that St. Paul owed no duty to defend, the breach of contract claim would also fail.